# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### April 18, 2018 Session

## CINDY TERRY v. JACKSON-MADISON COUNTY GENERAL HOSPITAL DISTRICT

**Appeal from the Circuit Court for Madison County**
**No. C12-186  Kyle Atkins, Judge**

———————————————————

**No. W2017-00984-COA-R3-CV**

———————————————————

A medical product sales representative brought suit against her former employer, a hospital, claiming retaliation in violation of the Tennessee Human Rights Act. After a bench trial, the trial court judge entered a verdict in favor of the hospital, having concluded that the employee failed to carry her burden of proof. In spite of dismissing the employee's case, the trial court awarded the employee a portion of her attorney's fees as "sanctions" against the hospital for making an allegedly late-filed motion to strike the employee's demand for a jury trial, which the trial court granted. We affirm the trial court's dismissal of the employee's retaliation claim, and we reverse the trial court's order granting the employee attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which BRANDON O. GIBSON and KENNY ARMSTRONG, JJ., joined.

Charles M. Purcell and Andrew V. Sellers, Jackson, Tennessee, for the appellant, Cindy Terry.

R. Dale Thomas, Geoffrey A. Lindley, and Jennifer Vallor Ivy, Jackson, Tennessee, for the appellee, Jackson-Madison County General Hospital District.

# OPINION

## BACKGROUND AND PROCEDURAL HISTORY

On July 13, 2012, Cindy Terry ("Appellant") filed suit in circuit court against her former employer, Jackson-Madison County General Hospital District (the "Hospital"), alleging retaliation in violation of the Tennessee Human Rights Act ("THRA").[1] Appellant averred that her supervisor, Ranee Terry ("R.T."),[2] retaliated against her when she learned that Appellant had participated in a human resources ("H.R.") investigation of R.T., in which it was alleged that R.T. used racial slurs when referring to African-Americans. According to Appellant, her participation in the H.R. investigation directly led to her termination and other acts of retaliation.[3] As discussed in detail below, the Hospital maintains that Appellant was terminated because of poor job performance.

Upon completion of discovery, a jury trial was scheduled to take place in November 2016. However, on October 26, 2016, the Hospital filed a "Motion for Non-Jury Trial." The Hospital averred that the Tennessee Supreme Court had recently determined that a litigant bringing a THRA claim in circuit court did not have a right to a jury trial. *See Young v. City of LaFollette*, 479 S.W.3d 785 (Tenn. 2015). Appellant responded opposing the motion and seeking an award of attorney's fees for the cost of responding to the motion, which Appellant averred was made in violation of the scheduling order.[4] A hearing on the motion was held on November 10, 2016, and the trial court indicated that he intended to grant the Hospital's motion for a non-jury trial. Also at the hearing, the trial court verbally indicated that he intended to grant Appellant's request for an award of attorney's fees for the costs of responding to the motion, and entered an order following the trial awarding Appellant attorney's fees.[5] At Appellant's

---

[1] Jackson-Madison County General Hospital District, Jackson-Madison County General Hospital, and Medical Center Medical Products are part of the West Tennessee Healthcare, Inc. system. Appellant originally brought suit against West Tennessee Health Care, Inc. and Jackson-Madison County General Hospital, Inc. as well as Jackson-Madison County General Hospital District. However, West Tennessee Health Care Inc. and Jackson-Madison County General Hospital, Inc. were voluntarily dismissed as defendants by agreed order entered December 7, 2012.

[2] Because Appellant Cindy Terry and her former supervisor, Ranee Terry, coincidentally share the same last name, Ranee Terry will be referred to as "R.T." throughout this opinion, and Cindy Terry will be referred to as "Appellant."

[3] Appellant originally brought several other claims along with her THRA claim for retaliation. However, all of her other claims were dismissed before the case proceeded to trial.

[4] The scheduling order does not appear in the record.

[5] On April 20, 2017, the trial court entered an "Order Granting Plaintiff Sanctions/Attorney Fees" in the amount of $9,630.00 against Appellee.

request, the trial was continued. On February 17, 2017, the trial court entered an order granting the Hospital's motion for a non-jury trial pursuant to the Tennessee Supreme Court's decision in *Young v. City of LaFollette*. *Id*.

The case was tried over the course of five days in February 2017, and the court heard testimony from fourteen witnesses. A summary of the proof adduced at trial follows.

In 2007, Appellant was hired to work as a medical product sales representative for an affiliate of the Hospital, Medical Center Medical Products ("MCMP"). During all times relevant to this appeal, MCMP employed one other sales representative, Paige Higgins. R.T. was the director of MCMP and supervised Ms. Higgins and Appellant. R.T. testified that Appellant and Ms. Higgins had the same job responsibilities which included securing referrals by contacting physicians, conducting educational in-service sessions,[6] attending and promoting MCMP's products and services at health fairs, driving the company vehicles, "calling on" physicians by visiting their offices to market MCMP's products and services, and communicating regularly with co-workers and supervisors.

During the 2010-2011 fiscal year, Appellant worked "as a team" with Ms. Higgins. Appellant and Ms. Higgins were paid a base salary plus commission if "the team" met the sales quotas for certain products and services each month (the "team incentive plan"). Ms. Higgins testified that under the team incentive plan, it did not matter who was responsible for the referrals; as long as the quotas were met, each sales representative received a set portion of the bonus commission for the month.[7] R.T. testified that MCMP sustained approximately a one million dollar loss during the 2010-2011 fiscal year when Ms. Higgins and Appellant worked "as a team."

On April 5, 2011, R.T. testified that she met with Ms. Higgins and Appellant to discuss changes that would be taking place in anticipation of the 2011-2012 fiscal year, which would begin on July 1, 2011. Because MCMP had sustained a loss during the 2010-2011 fiscal year, R.T. testified that she informed Ms. Higgins and Appellant that she was "looking at going back to the old way of doing things," whereby each sales representative would have their own territory and be individually accountable for their job responsibilities, including servicing the accounts in their individual territories. R.T. testified that she also instructed Ms. Higgins and Appellant to begin preparing weekly

---

[6] An "educational in-service" is an in-person informational meeting, in which a sales representative demonstrates a product or service to physicians and explains which patients qualify for referrals, etc. One type of an in-service is a "lunch-and-learn."

[7] However, Ms. Higgins testified that Appellant received a larger share of the monthly bonus commission because Appellant had been working at MCMP longer than Ms. Higgins.

sales activity reports that documented their sales activities from the week before (the "sales activity report(s)"), and she told them to send the weekly reports to her before the following Monday at 8:00 A.M. According to R.T., she also asked Appellant and Ms. Higgins to prepare monthly prospective marketing reports to show the in-service educational sessions that each sales representative had tentatively scheduled for the following month (the "marketing report"). The monthly marketing report was due before the first day of the upcoming month. Appellant acknowledged that she was told in the April 5, 2011 meeting that she would need to begin preparing weekly sales activity reports and sending them to R.T. by 8:00 A.M. the following Monday, but Appellant testified that she was not told to prepare a monthly marketing report.

Also on April 5, 2011, Sheila Noles, a co-worker of Appellant, filed a complaint with the human resources department of the Hospital ("H.R.") against R.T. Ms. Noles testified that she reported to Yvette Forrest, an H.R. employee, that R.T. had yelled at employees, made derogatory remarks to employees, and used racial slurs when referring to African-Americans. As a result of Ms. Noles' complaint, Ms. Forrest testified that she conducted a preliminary investigation and met with seven other employees of MCMP, including Appellant and Ms. Higgins, concerning R.T.'s conduct. According to Ms. Forrest's testimony, when the other employees echoed some of Ms. Noles' complaints, she alerted Karen Utley, a vice-president of the Hospital and R.T.'s direct supervisor. Ms. Utley testified that she asked Ms. Forrest to conduct a full investigation into R.T.'s conduct, and Ms. Forrest met with a total of sixteen employees of MCMP.[8] Ms. Forrest summarized the findings of her investigation and gave the written report to Ms. Utley. However, Ms. Forrest testified that the report did not include the names of the parties who participated in the investigation, and she did not tell Ms. Utley or anyone else "in the chain of command" the identities of the employees.[9] After Ms. Forrest's investigation was complete, Ms. Utley testified that she met with R.T. concerning the investigation to "counsel" her about the allegations and ways to improve her job performance. However, no additional adverse action was taken against R.T.

R.T. testified that on May 18, 2011, she met with Ms. Higgins and Appellant to discuss their goals for the upcoming 2011-2012 fiscal year. R.T. testified that she went over their job responsibilities, which included completing weekly sales activity reports, completing monthly marketing reports, conducting two in-service educational events per month to educate physicians, contacting physicians, creating advertising and promotional materials, driving the company vehicles, and making a monthly visit to each West Tennessee Healthcare entity in their territory. Appellant admitted that R.T. told her at the

---

[8] Ms. Utley testified that MCMP employed between fifty and sixty employees at all times relevant to this appeal.

[9] Ms. Utley testified that at no point before she made the decision to terminate Appellant did she know that Appellant participated in the investigation of R.T.

4

May 18, 2011 meeting that she was required to conduct two in-service events per month, complete weekly sales activity reports, attend meetings with staff, and create advertising materials. After the meeting, R.T. sent Appellant and Ms. Higgins an e-mail with a template for the sales activity report, and she reiterated that the report was due the Monday of the following week by 8:00 A.M.

In early June 2011, Ms. Higgins testified that she decided to approach R.T. to ask that she be assigned her own territory so that she and Appellant would be individually accountable for their job responsibilities during the 2011-2012 fiscal year. Ms. Higgins testified that she was "fed up" with sharing job responsibilities under the team incentive plan because Appellant "was not working." Specifically, Ms. Higgins testified that Appellant's attendance to her job had become "spotty," and she felt that the "sales efforts of MCMP were totally . . . on [her] shoulders."[10] According to Ms. Higgins, Appellant would not respond to voicemail or e-mail promptly, and she had been completing the weekly sales reports on her own every week because Appellant "was not interested in doing it." Furthermore, Ms. Higgins testified that Appellant had failed to show up the day before a recent medical conference to help set up MCMP's booth or on the day of the conference to promote MCMP's products and services. Ms. Higgins testified that Appellant did not notify her that she would be absent from the conference until after she was supposed to arrive on the day of the conference. Furthermore, Ms. Higgins testified that she had received an e-mail from Appellant on May 8, 2011, in which Appellant was critical of the Hospital.[11] Ms. Higgins testified that, "when [she] received [the] e-mail, [she] realized that [she] needed to find a way to be able to perform [her] job and not be associated so much with this, because this was not how [she] felt."[12]

On the morning of June 9, 2011, Ms. Higgins sent Appellant an e-mail before a regularly scheduled meeting with R.T. to inform her that she planned on bringing up the

---

[10] Ms. Higgins testified as follows:

> Q: What do you mean, very spotty?
>
> A: Some days she would work and some days she would not work.
>
> Q: And how do you know this?
>
> A: Because I would try to contact her, and she would tell me she was at home in bed.

[11] The e-mail contained a letter addressed to the Jackson Sun newspaper. The letter contained allegations of wrongdoing on the part of the Hospital and referred to the Hospital's CEO as a tyrant. Ms. Higgins testified that she does not know if Appellant actually sent the letter to the Jackson Sun. Appellant testified that she never sent the letter.

[12] Appellant does not dispute that she sent the e-mail to Ms. Higgins.

subject of dividing the territory at the meeting. In the e-mail, Ms. Higgins told Appellant that she felt that dividing the territory would provide them each with "more focused responsibility."[13] At the meeting, Appellant and Ms. Higgins were each assigned roughly half the counties in the territory.[14] R.T. testified that she gave Ms. Higgins and Appellant a spreadsheet of physicians and asked each of them to complete the spreadsheet by indicating which sales representative would be responsible for contacting each physician going forward.[15] R.T. testified that Ms. Higgins returned the spreadsheet, but Appellant never did. Appellant testified that she felt R.T. divided the territory in retaliation against her for participating in the H.R. investigation. On June 30, 2011, Appellant testified that she met with R.T. because she felt that the territory had been unfairly divided and the decision to split the territories did not "make sense financially." Appellant testified that she understood that R.T. had the authority to split the territory, but she wanted to have some additional input. R.T. testified that she asked Appellant to put her concerns in writing, which Appellant did in a letter dated July 5, 2011. In the letter, Appellant told R.T. that she felt that leaving the territories as they were was the "more logical business decision," but she would respect the choice to split the territory if R.T. was set in her decision. Also at the June 30, 2011 meeting, according to R.T., she asked Appellant about the status of a map, which she had asked Appellant to create in January 2011 to give clients directions between the two MCMP sales offices. Appellant had not completed the map.

In July 2011, Gary Abbott, the "pharmacy manager" for MCMP, testified that he approached R.T. because he was concerned that Appellant was not marketing a drug for pre-mature infants called Synagis, which was a high-revenue product for MCMP.[16] Ms. Higgins testified that Appellant told her she did not want to "grow the [Synagis] business quickly" because Appellant felt that if they grew "it quickly then the quota [would] go up and more [would] be expected of [them]." Based on Mr. Abbott's concerns, R.T. testified that she began to suspect that Appellant was reporting visits with physicians that she was not actually making. R.T. testified that she called ten of the physicians which Appellant claimed to have met with the previous month, and four of the physicians indicated that Appellant had not actually been there. R.T. testified that she had a GPS device placed on Appellant's company vehicle, and the GPS indicated that Appellant's

---

[13] Appellant handwrote on the e-mail from Paige Higgins, "beginning of retaliation."

[14] There were twenty-one counties in the sales territory of MCMP.

[15] Ms. Higgins testified that Appellant was angry with her for dividing the territories.

[16] As the pharmacy manager, Mr. Abbott worked with Ms. Higgins and Appellant to supply physicians with drugs such as Synagis. Mr. Abbott testified that he lived on the same street as Appellant, and he would often see her car at home during the work day when he went home for lunch. Mr. Abbott testified that he suspected Appellant was not being truthful to R.T. about her sales activities and visits, and he told R.T. about his suspicions.

company vehicle was not moved for the following two weeks. R.T. testified that she was having several other issues with Appellant's job performance in July 2011. Specifically, R.T. testified that Appellant was not turning in her weekly sales reports, was failing to timely respond to e-mails and phone calls, and was failing to set up in-service educational sessions.

On August 4, 2011, Appellant had a regularly scheduled meeting with R.T. and Ms. Higgins. R.T. testified that she inquired into the status of the map she asked Appellant to create in January 2011, and Appellant still had not completed it or her sales activity reports from the month before. After the meeting on August 4, 2011, R.T. testified that she decided to set up a meeting with Debbie Harris, a director of H.R., to discuss her concerns over Appellant's work performance. On August 5, 2011, R.T., Appellant, and Ms. Harris met. Ms. Harris testified that the purpose of the meeting was for R.T. to clearly delineate Appellant's job responsibilities and her expectations to Appellant in the presence of a neutral third party,[17] and Ms. Harris testified that R.T. clearly articulated both. R.T. testified that she told Appellant to turn in her weekly sales activity report by 8:00 A.M. the following Monday, communicate regularly, report to the office at 8:00 A.M. daily, and drive the company vehicle.

According to Appellant, R.T. accused her of falsifying her weekly sales activity reports and informed Appellant that she needed to improve her communication with R.T. and her other co-workers by responding daily to voicemail and e-mails. Appellant conceded that R.T. also inquired about Appellant's progress on the map assignment once again and told her again that she needed to drive the company vehicle at all times.[18] Appellant also testified that R.T. told her to report to the office by 8:00 A.M. According to Ms. Harris, Appellant indicated during the meeting that she did not agree with R.T.'s decision to divide the territory, and "she didn't agree that she needed to do what [R.T.] was asking her to do."

On August 10, 2011, Appellant testified that R.T. informed her that Ms. Higgins would be solely responsible for marketing Synagis going forward. R.T. testified that she decided to assign all Synagis marketing to Ms. Higgins because Appellant had failed to

---

[17] Specifically, Ms. Harris testified as follows:

> This meeting on August the 5th was the first step in explaining to Cindy Terry what she was doing that wasn't meeting her job expectations. That's part of our performance improvement process to explain to an employee what you're not doing. So the meeting wasn't so much about accusing her of doing anything. It was to say to Cindy, here's what I'm concerned about. Here's what you're not doing. And here's the documentation that shows it.

[18] Appellant admitted that she complained to co-workers that R.T. kept bothering her about "this damn map."

schedule any in-service educational sessions for August and had failed to communicate with Mr. Abbott. Appellant testified that R.T. told her to provide Ms. Higgins with any information concerning Synagis referrals and any Synagis events that Appellant had previously scheduled so that Ms. Higgins could take over the Synagis marketing. Later that day, R.T. testified that she emailed Appellant, Mr. Abbott, and Ms. Higgins informing them all that Ms. Higgins would be the only sales representative contact for Synagis throughout the entire territory going forward. R.T. testified that she instructed Appellant once again to e-mail all incoming information concerning Synagis to R.T. and Ms. Higgins so that Ms. Higgins could reschedule appointments and handle referrals. R.T. testified that she e-mailed Appellant three additional requests for the information, and Appellant failed to provide the information.

On August 18, 2011, Appellant and R.T. met again, and Appellant signed a copy of her job description listing her job responsibilities. The job responsibilities listed included sending tentative monthly marketing reports before the first of the upcoming month, conducting a minimum of two education in-services a month, and driving the company vehicle. R.T. also issued Appellant a written reprimand indicating, "further instance of insubordination or poor job performance [would] result in additional disciplinary action up to termination." R.T. testified that she inquired again about the status of the map assignment, but Appellant had still not prepared the map. R.T. testified that she also reminded Appellant that she must drive the company vehicle, and emphasized that Appellant needed to promptly respond to e-mails and phone calls during the work day. Appellant testified that she needed to drive her personal vehicle due to a medical issue, and she agreed to procure a physician's note for R.T. Appellant testified that she went to two physicians to procure a note, but neither physician provided her with one.

On August 26, 2011, R.T. testified that she entered Appellant's office to discover that Appellant had cleaned out all of her personal belongings. R.T. testified that Appellant had also told her that she was interviewing with a competitor.[19] When R.T. discovered Appellant's office had been cleared out, R.T. testified that she contacted Ms. Harris to ask what she should do, and Ms. Harris testified that she told R.T. to have Appellant's network access and e-mail shut down until they could meet with Appellant.[20]

On August 30, 2011, Appellant e-mailed R.T. and Ms. Harris stating that she would like to meet the following day. Appellant testified that she called the meeting because she believed her employment had been terminated based upon an e-mail from IT she had received stating that her account and intranet access had been shut down. At the

---

[19] Appellant does not dispute that she interviewed with a competitor.

[20] Ms. Harris testified that she did so because she did not want Appellant to send the Hospital's information to competitors.

August 31, 2011 meeting, Appellant testified that she told R.T. and Ms. Harris that she felt she was being retaliated against because she participated in the H.R. investigation of R.T. in April 2011. R.T. and Ms. Harris both testified that they were not aware that Appellant participated in the H.R. investigation until Appellant told them on August 31, 2011. Appellant also admitted that she told R.T. and Ms. Harris that they "should just fire" her. After Appellant told Ms. Harris and R.T. that she felt she was being retaliated against, Ms. Harris testified that she gave Appellant a complaint form and asked her to return it with a detailed account of the retaliation. It is undisputed that Appellant never returned the complaint form. Ms. Harris testified that she explained to Appellant that she had not been terminated. Ms. Harris testified that she explained to Appellant that she instructed R.T. to have Appellant's accounts shut down until they determined whether or not Appellant had resigned. At the end of the meeting, Ms. Harris asked Appellant if she was quitting, and Appellant responded that she did not know and she needed to confer with "someone from outside."

On September 1, 2011, Ms. Harris testified that she set up a meeting with Appellant and R.T. to clarify to Appellant what was expected of her. Ms. Harris testified that she called the meeting, in part, because she did not know if Appellant was planning on returning to work at all. R.T. testified that she told Appellant once again that she needed to clock-in at the office at 8:00 A.M., and she must drive the company vehicle because she had been unable to procure a doctor's note. R.T. also testified that she told Appellant that her work phone needed to be on all day during the business day. Appellant testified that R.T. also inquired as to what in-service educational sessions Appellant had scheduled for the month of September because R.T. had not received Appellant's monthly marketing report for August or September.

On September 7, 2011, Appellant sent R.T., Amy Griffin, and Barry Phillips an e-mail describing in detail her complaints concerning R.T. and requesting that Mr. Phillips or Ms. Griffin be present at any meeting between Appellant and R.T. going forward. Ms. Griffin is the compliance officer for the Hospital, and Mr. Phillips is the head of H.R. Appellant testified that she "felt her job responsibilities had been changing quite a bit, were continuing to change, that [she] was very confused, [and] that she felt like [she] was being singled out." After receiving the e-mail, R.T. testified that she contacted Mr. Phillips to ask if he would sit in on a meeting later that day between R.T. and Appellant, and Mr. Phillips agreed to do so. R.T. testified that Appellant asked to be terminated once again, but she told Appellant she did not want to terminate her.

On September 16, 2011, Appellant and R.T. met again. R.T. testified that Appellant had failed to send her a monthly marketing report for September or August and had not sent in a weekly activity report since August. On September 19, 2011, R.T. e-mailed Appellant requesting again that Appellant send her a list of the in-services and events she had conducted in August and was planning to conduct in September. R.T. testified that she sent an e-mail the following day asking once again. On the morning of

9

September 23, 2011, R.T. and Appellant had a regularly scheduled meeting. R.T. testified that she once again requested Appellant's monthly marketing report for September that was due by August 31, 2011, and the information concerning the two in-service educational sessions that Appellant was required to perform in August 2011. R.T. testified that she asked Appellant why she continued to have meetings with physicians in Ms. Higgins' territory, and Appellant testified that she told her they were personal visits with no business purpose.

After the meeting, R.T. testified that she decided to contact Ms. Utley to discuss terminating Appellant. Ms. Utley agreed with the termination, so R.T. contacted Ms. Harris. Later that day, Appellant was terminated in a meeting with Ms. Harris and R.T. Appellant testified that R.T. gave her a list of reasons why she was being terminated. Appellant testified that she did not know that she was being terminated for poor job performance until she was given a notice of separation, which listed poor performance as the reason for her termination.

Appellant testified that she filed a formal grievance to have her termination reviewed and a letter of complaint listing the reasons why she felt her termination was unjustified. On October 6, 2011, Appellant, R.T, Ms. Forrest, and Mr. Jeff Frieling, a vice-president of the Hospital who was not previously involved in the case, met for Appellant's grievance hearing.[21] Mr. Frieling testified that he carefully reviewed the information provided to him by Appellant and H.R., and he decided to uphold the termination.

On April 20, 2017, the trial court entered a final judgment dismissing Appellant's THRA claim, having concluded that she failed to carry her burden of proof. Also on April 20, 2017, the trial court entered an "Order Granting Plaintiff Sanctions/Attorney Fees" in the amount of $9,630.00 against Appellee. The trial court stated that it was awarding attorney fees "relate[d] to the [Hospital District's] motion to strike the jury and its resulting aftermath."

Appellant timely appealed.

ISSUES PRESENTED

Appellant has raised the following issues for our review, which we have rephrased and re-ordered as follows:

---

[21] Mr. Frieling testified that he was unaware until two weeks before his deposition that Appellant had participated in an H.R. investigation.

- Whether the evidence preponderates against the trial court's findings that Ms. Utley was the ultimate decision-maker or that Ms. Utley was unaware that Appellant participated in the investigation of R.T. when she agreed to terminate Appellant.

- Whether the trial court erred in concluding that Appellant failed to establish she was retaliated against because of her participation in the R.T. investigation.

- Whether the trial court erred in "failing to find that the decision by the Defendant to terminate the Plaintiff, Cindy Terry, was a pre-textual decision by the Defendant."

- Whether the trial court committed reversible error by failing to allow the entirety of Ms. Forrest's written report from the R.T. investigation into evidence or by failing to allow testimony concerning specific instances of conduct reported by employees during the R.T. investigation.

- Whether the trial court erred in granting the Hospital's motion for a non-jury trial.

In the posture of Appellee, the Hospital raises the following issues for our review, which we have rephrased and re-ordered as follows:

- Whether the trial court erred in awarding Appellant $9,630.00 for the cost of replying to the Hospital's motion for non-jury trial as sanctions against the Hospital.

- Whether the trial court committed reversible error in failing to admit evidence proffered by the Hospital.

### STANDARD OF REVIEW

In an appeal from a bench trial, we review the trial court's findings of fact *de novo* upon the record with a presumption of the correctness of the findings. *See* Tenn. R. App. P. 13(d); *Boarman v. Jaynes*, 109 S.W.3d 286, 289–90 (Tenn. 2003). We will not overturn a trial court's factual finding unless the evidence in the record preponderates against the finding. *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review the trial court's legal conclusions *de novo* with no presumption of correctness. *See Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

"Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations."

*State v. Flake*, 88 S.W.3d 540, 544 (Tenn. 2002). Our Supreme Court has noted that, "[c]redibility of witnesses plays a major role in retaliation cases, as the [fact-finder] is in a unique position to observe the demeanor of witnesses and assess their credibility." *Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 383 (Tenn. 2014).

### DISCUSSION

### I. THRA Retaliation Claim

"The employment-at-will doctrine is a bedrock of Tennessee common law." *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015) (quoting *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006)). The doctrine "recognizes that employers need the freedom to make their own business judgments without interference from the courts." *Mason v. Seaton*, 942 S.W.2d 470, 474 (Tenn. 1997). Thus, an at-will employee may be terminated at any time, for any reason, or for no reason at all. *See Williams*, 465 S.W.3d at 108 ("The long standing rule in this State is that an employee-at-will may be discharged without breach of contract for good cause, bad cause or no cause at all, without being thereby guilty of legal wrong.").

However, the legislature has imposed exceptions to the employment-at-will doctrine to protect the rights of employees who engage in certain protected activities. *See, e.g.*, Tenn. Code Ann. § 4-21-301. Relevant to this appeal, Tennessee Code Annotated section 4-21-301, i.e., the THRA, prohibits employers from retaliating against employees who oppose discriminatory practices in the workplace. *See id.* Specifically, the THRA prohibits, "[r]etaliat[ing] or discriminat[ing] in any manner against a person because such person has opposed a practice declared discriminatory by [the THRA] or because such person has . . . participated in any manner in any investigation, proceeding or hearing under [the THRA]." Tenn. Code Ann. § 4-21-301(a)(1). To prevail on a THRA claim for retaliation, the plaintiff must prove the following elements:

> (1) that the employee engaged in an activity protected by the THRA;
> (2) that the exercise of the employee's protected rights was known to the employer;
> (3) that the employer subsequently took a materially adverse action against the employee; and
> (4) that there was a causal connection between the protected activity and the materially adverse action.

*Ferguson*, 451 S.W.3d at 383 (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 29 (Tenn. 2011)).

12

The Tennessee legislature has prescribed a specific burden shifting framework applicable in THRA cases.[22] *See* Tenn. Code Ann. § 4-21-311(e). An employee who establishes a *prima facie* case of retaliatory discharge creates a rebuttable presumption that the employer unlawfully retaliated against the employee. *Id.*; *Jones v. City of Union City*, No. 2013-02358-COA-CV, 2015 WL 9257815, at *6 (Tenn. Ct. App. Dec. 17, 2015). The burden of production then shifts to the defendant to show a non-retaliatory reason for taking adverse action against the employee. *See* Tenn. Code Ann. § 4-21-311(e) ("If the plaintiff satisfies [the burden of establishing a *prima facie* case of retaliation], the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the challenged employment action."). If the defendant produces evidence of a non-retaliatory reason for taking adverse action against the employee, the burden shifts back to the employee-plaintiff to establish that the stated non-retaliatory reason was pre-textual, and the true motivation for the adverse action was retaliation. *Id.* "The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation." *Id.* "Despite the fact that intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the employer engaged in unlawful retaliation remains at all times on the plaintiff employee." *Williams*, 465 S.W.3d at 112–13.

As the plaintiff employee, Appellant had the initial burden at trial of presenting evidence to establish a *prima facie* case of retaliation. *See id.* at 114. After making an implicit finding that Appellant satisfied her initial burden, the trial court found that the Hospital produced evidence of a non-retaliatory reason for terminating Appellant.[23]

---

[22] In full the provision reads as follows:

(e) In any civil cause of action alleging a violation of this chapter or of § 8-50-103, the plaintiff shall have the burden of establishing a prima facie case of intentional discrimination or retaliation. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the challenged employment action. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination or retaliation raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the challenged employment action and that the stated reason was a pretext for illegal discrimination or retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation.

Tenn. Code Ann. § 4-21-311(e).

[23] We proceed with our analysis as if Appellant made out a *prima facie* case. *See Jones*, 2015 WL

13

Thus, the burden shifted back to Appellant to prove by a preponderance of the evidence "that the legitimate reasons offered by [the Hospital] were not its true reasons, but were a pretext for retaliation." *Id.* at 113 (citation omitted). The trial court concluded that Appellant failed to establish that the ultimate decision-maker, Ms. Utley, knew Appellant participated in the H.R. investigation of R.T. and that Appellant failed to proffer sufficient evidence to support her claim that her termination was causally linked to her participation in the H.R. investigation of R.T.[24]

On appeal, Appellant contends that the trial court erred in failing to conclude that R.T. was the sole decision-maker responsible for her termination that R.T. had knowledge of her participation in the investigation, and that R.T. fired Appellant in retaliation. Furthermore, Appellant avers that the trial court erred in failing to allow the totality of Ms. Forrest's written investigation of R.T. into evidence along with testimony of specific instances of conduct reported by employees during the investigation. We will now evaluate Appellant's assignments of error in turn.

**A.**

The second element of a *prima facie* case for retaliatory discharge under THRA is knowledge or notice to the employer that the employee engaged in a protected activity. *Ferguson*, 451 S.W.3d at 382 (citing *Sykes*, 343 S.W.3d at 29). "The rationale behind the knowledge requirement is that an employer should not be held liable for retaliation when it has no knowledge that the employee has engaged in [a] protected activity." *Id.* "Knowledge of an employee's protected activity can be shown by either direct or circumstantial evidence." *Id.* (citations omitted).

The trial court found that Ms. Utley was the ultimate decision-maker responsible for terminating Appellant, and Ms. Utley had no knowledge that Appellant participated in the H.R. investigation of R.T. when she decided to terminate Appellant. The trial court concluded that Appellant failed to offer any proof that Ms. Utley knew Appellant participated in the investigation when she told R.T. to terminate Appellant. Furthermore, the trial court found that Ms. Utley was a credible witness but that Appellant's testimony contained "a lot of inconsistencies." Appellant avers that the evidence preponderates against the trial court's findings.

---

9257815, at *7 n.3 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.") (citations omitted).

[24] The first and third elements are not in dispute in this case. Appellant participated in a protected activity when she reported R.T.'s use of racial slurs to Ms. Forrest during the H.R. investigation of R.T. in April 2011. *See Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 434 (Tenn. Ct. App. 2015). It is also undisputed that Appellant was eventually fired on September 23, 2011. *See Barnes*, 48 S.W.3d at 707 (termination of employment is an adverse action under the THRA).

Having carefully reviewed the record, we have concluded that the evidence supports the trial court's findings that Ms. Utley was the ultimate decision-maker and its finding that she was unaware that Appellant participated in the H.R. investigation of R.T. when she decided to fire Appellant. Ms. Utley testified that R.T. could not have terminated Appellant by herself, and she had no knowledge that Appellant participated in the investigation when she agreed to terminate Appellant. Ms. Forrest testified that she redacted the names of the participants in the report of the investigation she gave to Ms. Utley. Ms. Utley and Appellant testified that Appellant never told Ms. Utley she participated in the investigation, and Ms. Utley testified that Appellant never contacted her or sought to meet with her because she felt she was being subjected to retaliation.

"Credibility of witnesses plays a major role in retaliation cases[.]" *Id.* at 383. We will not second guess the trial court's determinations that Ms. Utley was a credible witness or that Appellant gave "inconsistent" and ultimately unconvincing testimony. *See Barnett v. B.F. Nashville, Inc.*, No. M2016-00762-COA-R3-CV, 2017 WL 2334229, at *9 (Tenn. Ct. App. May 30, 2017) ("[T]rial courts are best situated to evaluate witness credibility, and appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.").

For the first time on appeal, Appellant takes the position that R.T. was the sole decision-maker responsible for Appellant's termination. However, during his opening statement at trial, Appellant's attorney stated, "[t]he two decision-makers for termination of [Appellant] were [R.T.] and *Ms. Karen Utley* . . . Ms. Utley fired [Appellant][.]" Appellant's attorney clearly argued at trial that Ms. Utley made the ultimate decision to fire Appellant. "[T]he law does not permit a litigant to take one position at trial and a different and inconsistent position on appeal."[25] *Hutson v. Safe Star Trucking*, No. E2012-00651-COA-R3-CV, 2012 WL 5354985, at *2 (Tenn. Ct. App. Oct. 31, 2012) (quoting *In re Estate of Schultz v. Munford, Inc.*, 650 S.W.2d 37, 40 (Tenn. Ct. App. 1982)). The record does not preponderate against the trial court's findings that Ms. Utley was the ultimate decision-maker, and that she had no knowledge of Appellant's participation in the H.R. investigation.

## B.

A plaintiff claiming retaliation under the THRA must also establish that but-for the plaintiff's participation in the protected activity, the employer would not have taken adverse action against the plaintiff. *See Goree v. United Parcel Serv., Inc.*, 490 S.W.3d

---

[25] We point out that Appellant also takes inconsistent positions concerning the identity of the ultimate decision-maker in her appellate brief. First, the Appellant argues that, [i]t is clear from [R.T.'s] own testimony it was she who made the ultimate decision to terminate and [Ms. Utley] simply approved it." Then, Appellant argues that Mr. Frieling "could have easily reversed the decision to terminate the Plaintiff, and therefore was actually the ultimate decision maker as to [Appellant's] termination. As stated above, Mr. Frieling also had no knowledge that Appellant participated in the H.R. investigation of R.T.

413, 434 (Tenn. Ct. App. 2015) ("[A] plaintiff making a retaliation claim under the THRA 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'"). "'But-for' causation means that 'the causal link between injury and wrong is so close that the injury would not have occurred but for the act.'" *Id.* at 429 (citation omitted). Put another way, the employee must show that the employer's decision to take adverse action "was actually motivated by a desire to retaliate against the employee." *Id.* at 439–40 (quoting *Allen v. McPhee*, 240 S.W.3d 803, 821 (Tenn. 2007)). "A plaintiff's subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge cannot, in and of themselves, create the requisite causal relationship." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006).

As an initial matter, Appellant attacks the trial court's order arguing that the court "made no findings or conclusions of law to support the ruling that Plaintiff failed to carry her burden of proof as the fourth element [i.e., causation] of her *prima facie* case[.]" Tennessee Rule of Civil Procedure 52.01 requires, in pertinent part, as follows:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

The law in Tennessee is well-settled that the court speaks through its order, not through the transcript, so appellate courts do not review the court's oral statements, unless incorporated in a decree. *See Traylor ex rel. Traylor v. Shelby Cty. Bd. of Educ.*, No. W2013-00836-COA-R3-CV, 2014 WL 792131, at *7 (Tenn. Ct. App. Feb. 27, 2014). However, in this case, the trial court judge clearly *did* incorporate his oral findings into his final order by reference. Specifically, the trial court's order states that "a transcript of the [oral] ruling is attached and incorporated into this order as if set out verbatim." The trial court made findings which span eight pages of transcript concerning the causation element alone. Therefore, Appellant's contention that the trial court did not make sufficient findings to support its conclusion that Appellant failed to establish that her termination was causally linked to her participation in the H.R. investigation of R.T. is without merit.

In concluding that Appellant failed to meet her burden of proof with respect to the causation element, the trial court stated as follows, "Plaintiff [cannot] rely on just her personal belief that there [was] retaliation. She must present evidence, either direct or circumstantial[.]" The trial court found that Appellant did not produce any direct evidence of retaliation and "little, if any, circumstantial evidence of retaliation." Furthermore, the trial court pointed out that the Hospital proffered substantial evidence concerning Appellant's substandard performance.

16

Appellant avers that the trial court erred in concluding that Appellant did not offer sufficient proof to establish that but-for her participation in the investigation, she would not have been terminated. Although the argument is somewhat unclear, Appellant appears to argue that the trial court erred in failing to find the circumstantial evidence Appellant offered to be persuasive and by failing to credit Appellant's testimony in light of the countervailing evidence presented by the Hospital. Appellant avers that the facts of this case are analogous to the facts in *Sykes v. Chattanooga Housing Authority*. *See Sykes*, 343 S.W.3d at 29. Specifically, Appellant avers that she offered evidence of a close temporal proximity between her participation in the investigation and her termination, evidence that she had a "good work history" before her termination, and evidence that the Hospital did not follow its own policies by failing to stop R.T. from "retaliating" against Appellant.

As an initial matter, we point out that in *Sykes*, the issue before the Tennessee Supreme Court was whether the trial court properly granted summary judgment to the defendant employer when the employee had proffered circumstantial proof of retaliation. *See id.* at 30. In the case currently before us, the trial court conducted a five-day trial before concluding that Appellant failed to establish that the Hospital took adverse action against her because she participated in the H.R. investigation. As the trial court pointed out, Appellant relied almost exclusively on her own testimony in attempting to establish her claim. Appellant presented no direct proof of retaliation, and little circumstantial proof. When Appellant was questioned by her attorney concerning the circumstances surrounding the alleged retaliation, the following exchange occurred:

Q: Did you come to conclude that you were on the receiving end of retaliation?

A: Absolutely.

Q: Let's talk about that. Tell me—tell me when you began to feel as though you were being retaliated against.

A: I began to feel that way the day my territory was realigned. On top of that I was given issues on a weekly basis—or procedures that needed to [be] followed instead of issues on a weekly basis that needed to be done that I had had no knowledge of in my entire career at the hospital.

Q: All right. You're going to have to help me on that. Tell—tell me specifically what you're talking about.

A: I was told that I must set up a certain number of in-services. I was told that I must set up a certain number of lunches and dinners, that I was to provide educational programs. I was told when I was to turn in my

17

commission reports or else I would not be paid. I was told that if I had any request for marketing materials and it was not done by a certain time, then they would be denied and not paid. I was told I would not have responsibility for product lines which I had always sold. I was told to work with different managers of different departments on sales calls, which I had never been told, but I had done in the past. I had included them where need be. I was told about the previous sales activity report that we discussed. I was told about the accounts I would cover and would not cover. I was told about my Blackberry, that I was to keep it on with me at all times, when previously in my career it became an issue about having your phone on a sales call.

Appellant's belief that she was being retaliated against is not sufficient to establish causation. The trial court was free to credit the testimony of the Hospital's witnesses that Appellant was told to do the things which Appellant characterized as "retaliation" as part of her job responsibilities, and that she was disciplined because she did not complete the assignments she was asked to complete. The legislature has made clear that Appellant at all times bore the burden of persuasion in this case. Tenn. Code Ann. § 4-21-311(e) ("The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation."). As we stated above, the trial court found that Appellant gave "inconsistent" testimony and that the Hospital's witnesses were credible. "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn. 1998). As we have noted before in a similar THRA case, "the trial court's decision was inescapably dependent on the trial court's observation and assessment of the demeanor and credibility of the various witnesses." *Barnett*, 2017 WL 2334229, at *9. We will not reweigh the evidence or reevaluate credibility determinations on appeal.

Furthermore, the trial court found, and our review of the record confirms, that the Hospital put on persuasive proof that Appellant was terminated because she "failed to cooperate with the split in territories, that [Appellant] failed to turn in weekly activity reports, that [Appellant] failed to drive the company car, [and] that [Appellant] failed to communicate with R.T. and the managers and her co-workers." The trial court found that Appellant admitted that R.T. requested the map assignment from her in January 2011, and she had failed to turn it in until at least August 2011.[26] The trial court found Ms. Harris' testimony to be credible and pointed out that Ms. Harris testified that she saw R.T. work with Appellant and "[Appellant] just did not respond" and "disregarded the changes that were made in the division of the territory." The trial court also noted that

---

[26] R.T. testified that Appellant never turned in the map.

18

Appellant failed to put on any proof of a similarly situated employee who was treated differently. Specifically, the trial court noted that, "[a]ll of [the assignments] were asked of both Paige Higgins and Cindy Terry, and I think it's important to note that they were both asked to do these things. Paige Higgins did them; Cindy Terry did not comply." Furthermore, the trial court pointed out that on "many" occasions Appellant told her superiors to fire her, concluding that "[i]t was almost as if she was just not doing what she needed to do in the hopes of being fired."

Our own review of the record supports the trial court's conclusion that Appellant failed to establish a causal connection between her participation in the investigation and the Hospital's actions. Appellant's own testimony undercuts her claim that adverse action was taken against her because she participated in the investigation. Appellant testified that she believed that the split in territories in June 2011 was the beginning of the retaliation against her. However, Appellant testified that the split in territories was discussed as early as April 2011—before Appellant even participated in the H.R. investigation of R.T. Ms. Harris and R.T. testified that they were not aware Appellant participated in the investigation until August 31, 2011, when Appellant herself told them she participated. Ms. Forrest testified that she did not include the names of any of the participants of the investigation when she gave her report to Ms. Utley.

The record is replete with evidence of Appellant's insubordination and refusal to perform her job requirements. Appellant's refusal to accept the change in territory and do her job is illustrated by the actions she took with respect to the marketing of Synagis. When Mr. Abbott informed R.T. that he felt Appellant was not marketing Synagis, R.T. testified that she called several pediatric physicians, including Dr. Davis-Thorpe and found out that Appellant had not been there and had falsified her sales report. Appellant testified that at a meeting on August 10, 2011, R.T. informed her that Ms. Higgins would be solely responsible for Synagis marketing going forward, and Appellant testified that R.T. told her to send her and Ms. Higgins any information concerning upcoming Synagis events and lunches she had scheduled. Appellant failed to send R.T. the requested information, and she responded two days later to R.T.'s third follow-up e-mail that R.T. could "just check her outlook calendar."

There are many other examples in the record of Appellant's sub-standard performance and insubordination. R.T. and Ms. Harris testified that R.T. repeatedly told Appellant to send a weekly sales activity report, drive the company vehicle, and communicate during the workday. Despite repeated conversations in which Ms. Harris and R.T. clearly explained to Appellant that these requirements were mandatory, Appellant continued to drive her personal car, failed to communicate reliably, failed to send in her monthly marketing report, and failed to send in her weekly sales activity reports. The record also reveals numerous instances of Appellant's inappropriate, disrespectful, and unprofessional behavior towards R.T. and her co-workers.

19

Having carefully considered the record, we affirm the trial court's ruling that Appellant failed to prove that she was retaliated against based upon her participation in the H.R. investigation.

**C.**

Appellant avers that the "trial court erred in not finding that the Defendant's proffered reason for the Plaintiff's termination was pre-textual." However, Appellant cites to no legal authority in support of her arguments in the section of her brief concerning this issue. Appellant argues that the actions taken by R.T. and Ms. Utley in terminating her were motivated by a desire to retaliate rather than as a reaction to her sub-standard job performance. As discussed above, the evidence in the record does not preponderate against the trial court's finding that Appellant failed to prove that the Hospital terminated her because she participated in the H.R. investigation of R.T.

**D.**

Next, Appellant argues that the trial court committed reversible error by failing to admit the totality of Ms. Forrest's written report from the investigation of R.T. and by failing to permit testimony concerning specific instances of conduct related to the investigation of R.T. In ruling to exclude the evidence, the trial court found that the evidence was not relevant and, even if relevant, any probative value was substantially outweighed by the risk of unfair prejudice. Appellant avers that "[t]he complaints made during the investigation of Ranee Terry, as well as the results and findings of that investigation, are extremely relevant, especially as it pertains to employees' complaints regarding Ranee Terry's management style of intimidation and retaliation."

"Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion and will not be disturbed on appeal unless the trial court abused its discretion." *See Rodriguez v. Bridgestone/Firestone N. Am. Tire, LLC*, No. M2013-01970-COA-R3-CV, 2017 WL 4513569, at *9 (Tenn. Ct. App. Oct. 10, 2017) (citation omitted). A trial court abuses its discretion when the court applies an incorrect legal standard, reaches an illogical conclusion, or employs reasoning that causes an injustice to the complaining party. *Id.* As noted in *White v. Vanderbilt University*:

> Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness....The erroneous exclusion of evidence will not require reversal of the judgment if

the evidence would not have affected the outcome of the trial even if it had been admitted.

21 S.W.3d 215, 222–23 (Tenn. Ct. App. 1999).

Appellant avers that the report would have established that the Hospital's real reason for terminating Appellant was because she participated in the investigation of R.T. As discussed above in detail, we have concluded that the trial court's finding that Ms. Utley was the ultimate decision-maker is supported by the evidence in the record. Furthermore, the record supports the trial court's conclusion that Appellant failed to establish that Ms. Utley knew that Appellant participated in the investigation of R.T. when she decided to terminate Appellant. Therefore, the details of the report had very little, if any, relevance to Appellant's THRA claim because Ms. Utley did not even know Appellant was involved in the investigation of R.T. The trial court did not commit reversible error in failing to include the totality of the R.T. investigation and testimony concerning specific instances of conduct related to the investigation.

## II. Motion for Non-Jury Trial

As mentioned above, on October 26, 2016, the Hospital filed a motion for a non-jury trial pursuant to Tennessee Rule of Civil Procedure 39.01, alleging that the Tennessee Supreme Court's recent decision in *Young v. City of LaFollette* indicated that Appellant did not have a right to a jury trial on her THRA claim because it was filed in circuit court. After a hearing, the trial court ruled in the Hospital's favor and rescheduled the case for a bench trial. On appeal, Appellant avers that the trial court erred in allowing Appellant to file the motion "on the eve of trial" and in granting the motion on the merits. We disagree.

The Hospital made the motion for a non-jury trial pursuant to Tennessee Rule of Civil Procedure 39.01, which provides, in relevant portions, as follows:

> When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless . . . (b) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the State of Tennessee.

Rule 39 clearly places no time limitation on a movant. *Id*. Appellant fails to cite to any authority in her brief to support her contention that the trial court should have declined to hear the motion because it was made "on the eve of trial." Moreover, Rule 3.3 of the Tennessee Rules of Professional Conduct requires an attorney to be candid towards the tribunal, and a failure to disclose dispositive legal authority of which an attorney is aware can be considered a violation of the rule. *See* Tenn. R. Prof. Conduct 3.3, cmt. 4 ("The

underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case."). Thus, we agree with the trial court's decision to hear the motion despite Appellant's contention that it violated the scheduling order.[27]

We also affirm the trial court's decision to grant the Hospital's motion for a non-jury trial. The THRA does not specifically indicate whether a litigant is entitled to a jury trial in either circuit or chancery court. However, in *Sneed v. City of Red Bank*, the Tennessee Supreme Court held that the broad right to a jury trial conferred by Tennessee Code Annotated section 21-1-103 applies to THRA claims brought in chancery court. *See Sneed v. City of Red Bank, Tenn.*, 349 S.W.3d 17, 30 (Tenn. 2014); *see also* Tenn. Code Ann. § 21-1-103 ("Either party to a suit in chancery is entitled, upon application, to a jury to try and determine any material fact in dispute[.]"). However, Tennessee Code Annotated section 21-1-103 does not confer a right to trial by jury in cases brought in circuit court. *See* Tenn. Code Ann. § 21-1-103. In *Young v. City of LaFollette*, the Tennessee Supreme Court reiterated that neither the THRA nor Tennessee Code Annotated section 21-1-103 provides a litigant with a right to trial by jury in the circuit court. The Supreme Court explained, "[i]n *Sneed*, the right to jury trial existed in chancery court by virtue of a separate statute. There is no similar statute granting a right to trial by jury in circuit court." 479 S.W.3d 785, 794 n.8 (Tenn. 2015). For the foregoing reasons, we agree with the trial court that Appellant was not entitled to a jury trial in this case.

### III. Attorney's Fees Arising From Appellee's Motion For Non-Jury Trial

The Hospital avers that the trial court abused its discretion when it awarded Appellant $9,630.00 in attorney's fees for the cost of replying to the Hospital's motion for non-jury trial as "sanctions" against the Hospital for causing "undue delay." Appellant avers that the sanctions were pursuant to Rule 11 of the Tennessee Rules of Civil Procedure and that the trial court acted within the confines of the law in awarding the fees.

"Courts have the inherent power to supervise and control their own proceedings and to sanction attorneys for conducting themselves in a reckless manner." *Wright v. Quillen*, 909 S.W.2d 804, 815 (Tenn. Ct. App. 1995) (citing *Andrews v. Bible*, 812 S.W.2d 284, 291 (Tenn. 1991)). Tennessee Rule of Civil Procedure 11.02 provides that an attorney may be sanctioned for filing a motion "for any improper purpose, such as to harass or to cause unnecessary delay or needless cost of litigation." Tenn. R. Civ. P. 11.02. Under the appropriate circumstances, the court may award "the reasonable expenses and attorney's fees incurred in presenting or opposing the motion," as well as

---

[27] We point out that the scheduling order does not appear in the record, so we are unable to verify Appellant's claim.

appropriate sanctions. Tenn. R. Civ. P. 11.03(1)(a). Rule 11.03 outlines the appropriate measure of sanctions to be awarded to the movant:

> A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (a) and (b), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

Tenn. R. Civ. P. 11.03(2).

In this case, the trial court agreed with the Hospital that Appellant was not entitled to a trial by jury, but the trial court then awarded Appellant her attorney's fees for the costs incurred as a result of the Hospital's motion. Appellant's attorney complains in her brief that, "[t]he Plaintiff would state that the Defendant's late filing of their Motion for Non-Jury Trial was not only dilatory, but was done strategically after the Plaintiff planned her case strategy on the basis that this would be a jury trial." It was not the responsibility of the Hospital's attorney to research Appellant's attorney's case or to assist Appellant's attorney in developing his case strategy. Nor is it the responsibility of the Hospital to reimburse Appellant because Appellant's attorney was unaware of the significance of new case law. Neither the trial court nor Appellant point to any legal authority to support the trial court's decision to sanction the Hospital for making a non-frivolous motion, which the trial court granted. The trial court simply stated that it was awarding the fees because the Hospital caused "undue delay" in making the motion. We respectfully disagree. Appellant was not entitled to a trial by jury, and the Hospital violated no rule in making the motion. Moreover, we point out that the Appellant was the party who asked that the case be continued—not the Hospital.

Additionally, we point out that Appellant failed to comply with the mandatory safe harbor provision of Rule 11.03 because Appellant failed to make the motion for sanctions separately from the response to the Hospital's motion. *See* Tenn. R. Civ. P. 11.03(1)(a). In *Ewan v. Hardison*, we reiterated that compliance with the safe harbor provision is mandatory stating as follows:

> The Rule further provides that a motion for sanctions under Rule 11.03 "shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision 11.02." *Id.* This Court has held that the safe harbor provision is "clear, unambiguous and mandatory." *Shappley*, 290 S.W.3d at 202. "Attorneys and litigants should be able to place their expectation and reliance upon the fact that Rule 11

23

means what it says, and that a party will not be sanctioned unless his or her opponent has followed the procedure for requesting sanctions as set forth in the rule." *Mitrano v. Houser*, 240 S.W.3d 854, 862 (Tenn. Ct. App. 2007). **"An award of sanctions absent demonstrated compliance with the safe harbor provision cannot stand."** *Lindsey v. Lambert*, No. W2010–00213–COA–R3–CV, 2011 WL 497248, at *1 (Tenn. Ct. App. Feb. 11, 2011) (citing *Shappley*, 290 S.W.3d at 202).

465 S.W.3d 124, 139 (Tenn. Ct. App. 2014) (emphasis added).

The trial court abused its discretion in awarding attorney's fees to Appellant when the Hospital made a non-frivolous motion, which was granted by the trial court, and Appellant failed to comply with the mandatory safe harbor provision of Rule 11.03. Therefore, we reverse the trial court's order awarding attorney's fees to the Appellant and against the Appellee.

The remaining evidentiary issues raised by the Hospital are pretermitted.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's dismissal of Appellant's THRA claim because Appellant failed to meet her burden of proof. We affirm the trial court's decision to grant the Hospital's motion for a non-jury trial, but we reverse the trial court's order granting Appellant attorney's fees against the Appellee in the amount of $9,630.00.

_____
ARNOLD B. GOLDIN, JUDGE

24