IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 12, 2021 Session

## PARK PLACE BOAT DOCK ASSOCIATION, INC., ET AL. v. GARY PHILLIPS CONSTRUCTION, LLC, ET AL.

Appeal from the Chancery Court for Washington County
No. 19-CV-0044      John C. Rambo, Chancellor

---

No. E2021-00160-COA-R3-CV

---

This appeal concerns easement rights.  The Park Place Community Association, Inc. ("the PPCA") and the Park Place Boat Dock Association, Inc. ("the PPBDA") ("Plaintiffs," collectively) filed suit in the Chancery Court for Washington County ("the Trial Court") against Gary Phillips Construction, LLC and Gary Phillips ("Phillips").[1]  Plaintiffs sought access to a certain boat dock and sun deck on Boone Lake over a strip of land previously owned by the community's developer that Phillips bought at a bankruptcy auction.  After a trial, the Trial Court found Plaintiffs had proven the elements of an easement by implication and an easement by necessity over the property at issue.  Phillips appeals raising a number of issues, including whether Plaintiffs have standing.  We find, *inter alia*, that Plaintiffs have standing to bring this action.  We further find that lake access has been, and is, essential for Plaintiffs' use and beneficial enjoyment of Park Place, in some instances representing the exclusive reason why people bought their homes in the community.  Plaintiffs have proven the elements of an easement by implication and an easement by necessity.  We affirm the judgment of the Trial Court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

---

[1] In his brief, Phillips represents as follows regarding Gary Phillips Construction, LLC: "Gary Phillips Construction is a sole proprietorship of Gary Phillips and is not the same as Gary Phillips Construction, LLC which was the subject of a Chapter 11 bankruptcy which was converted to a Chapter 7 bankruptcy." Karla Phillips also was sued but later was dismissed.

Rick J. Bearfield and Catherine Karczmarczyk, Johnson City, Tennessee, for the appellant, Gary Phillips.

Michael S. Lattier and Marcy W. Walker, Kingsport, Tennessee, for the appellees, Park Place Boat Dock Association, Inc., and Park Place Community Association, Inc.

## OPINION

## Background

In January 2019, Plaintiffs filed suit in the Trial Court against Gary Phillips Construction, LLC, and Phillips, individually. Plaintiffs alleged an easement by implication and by necessity over Phillips' property to access Boone Lake. Plaintiffs described themselves as homeowners associations chartered in accordance with the Tennessee Nonprofit Corporation Act. Park Place, the residential community from which this dispute emerged, is located on Boone Lake. Plaintiffs alleged that prior to 2018, Park Place boat slip owners enjoyed full use of their boat slips and that members of the Park Place community frequently utilized the adjacent deck for activities. A small strip of land ("the 2.4 Acre Tract") separates the boat slips and deck from a Park Place common area ("the Common Area"). The 2.4 Acre Tract formerly was owned by Park Place developer Jerold R. Howard ("Howard"), who later filed for bankruptcy. In November 2014, the 2.4 Acre Tract was sold at auction to Gary Phillips Construction for $5,500. Two of sixteen boat slips also were sold at auction. Phillips proceeded to place a "no trespassing" sign in front of the fence on the Common Area. Plaintiffs also alleged that Phillips told boat slip owners they could not access their boat slips and that, in fact, he owned the boat slips. Plaintiffs stated four counts: (1) an easement by necessity; (2) an easement by implication; (3) a request for injunction; and (4) a request for declaratory judgment. In their prayer for relief, Plaintiffs asked for the following:

> 1. For a Judgment in favor of Plaintiffs and against Defendants recognizing Plaintiffs' easement rights over the Property and to the use of the gazebo and deck and to the stairs leading to those;
> 2. For a Judgment in favor of Plaintiffs and against Defendants recognizing Plaintiffs' ownership of the boat dock and boat slips;
> 3. That a preliminary injunction be issued seeking the relief set forth in Count IV above to remain in effect until the conclusion of this matter;
> 4. For a permanent injunction in accordance with the relief prayed for in this Complaint;
> 5. That the Court retain jurisdiction of this matter in order to enforce its orders and all injunctive relief; and

6. For such other and further relief as the court may deem just and proper.

In response, Phillips filed a motion to dismiss. Phillips asserted that Plaintiffs lacked standing to seek relief on behalf of their members. The Trial Court denied Phillips' motion to dismiss. Phillips thereafter filed an answer. In addition to his general denials, Phillips stated:

25. With respect to the allegations of Paragraph 25 of the Complaint, the question of ownership is a question of law and Gary Phillips has never taken the position that he owns the boat slips. Notably, the boat slips which are not owned by Gary Phillips are located on the land which is owned by Gary Phillips d/b/a Gary Phillips Construction, a sole proprietorship. The Plaintiffs do not have any evidence or indicia of ownership of the Boat Slips, either, and thus lack standing to maintain this action.

This matter was tried without a jury in December 2020. Howard, Park Place's developer, testified first. Initially, Howard was a partner in Park Place's development, which began around the year 2000. Howard later became sole partner in the endeavor. The plan for Park Place was to build single-family homes on 50 acres. Asked how important lake access was for Park Place, Howard stated "[i]t's everything" and "[t]he whole subdivision was planned around the lake." Howard remained involved with Park Place until 2013 or 2014. Howard testified that he obtained a permit from the Tennessee Valley Authority to build an initial dock. Howard later obtained a TVA permit for a fixed dock, or "sun deck." Howard received approval for 66 boat slips; 16 were built. Howard obtained a permit for the boat slips in 1999. Howard sold the boat slips to Park Place homeowners for around $10,000 apiece, which were deeded to the buyers. Howard stated: "I don't recall not deeding any, not being present at a closing for any of the boat slips." Asked why he did not feel the need to include easements in deeds, Howard stated: "There should be no need for an easement. Those -- those, the fixed dock and the floating docks, are attached to the common area, as you showed in the first exhibit from TVA. That's -- that's what they were based on. The ability to build the slips was based on Lot 10, which is the common area." Howard testified further:

Q. And when did you start building [the boat slips]?
A. The first eight were built probably the year after I built my first house, which is the house I lived in. So I guess around -- again, I'm not good at dates. I don't recall the exact year, but the same year I built my house. The following summer I started building the boat slips.
Q. Would that have been in early 2000?
A. Yes. Yes.

Q. Now you have the sun -- what we call the sun deck or the fixed deck, you had that built prior to the boat slips, correct?
A. Yes. Yes. I think, as I recall -- as I recall, it was either built the same year I built my house or maybe even started construction before -- as soon as the lake went down that winter. So probably the same year I built my house that fixed dock was built.
Q. Would that have been in early 2000?
A. Yes.
Q. Now why did you build that sun deck?
A. To help sell lots.
Q. Sell lots in Park Place.
A. Yes.
Q. Did you use that sun deck in advertisements for sales of the homes?
A. Yes.

Howard was then asked about his own use of the sun deck and boat dock, as well as whether he saw other community members use these features:

Q. All right. During all the years that you lived there, how did you use the boat dock and the sun deck?
A. I had a golf cart and I drove from -- I ended up moving to Oliver Approach, which was at the very end of the subdivision where it ends at the other end from the common area. So I had a golf cart. I actually had two golf carts and we drove down to the common area and parked and accessed the lake from there.
Q. And would you use the sun deck?
A. Quite frequently.
Q. How did you use it?
A. We swam off of it. My kids -- my kids and I swam off of it. I spent a lot of time there waiting on my boat to come back.
Q. Someone else would take your boat...
A. One of the kids were out in the boat.
Q. And how did you use the boat dock?
A. We parked our pontoon boat and our -- and our speed boat there.
Q. Did you see other homeowners using those areas?
A. Sure.

Continuing his testimony, Howard stated that he became acquainted with Phillips in 2004 or 2005 through selling him property in Park Place. In 2005, Howard deeded the Common Area to the PPCA; he reserved for himself a right-of-way for ingress and egress from the 2.4 Acre Tract over the Common Area. Howard stated:

-4-

Q. What was the reason that you had that put in the...

A. I imagine the attorney wanted to make sure that -- whoever drew this up wanted to make sure that I couldn't -- that the boat slip owners association could not be denied once it was formed, and it was not formed for a long time after this, but that they could never be denied use of their -- of their boat slips even though they are attached to Lot 10.

Q. Is that what you thought this did?

A. That's exactly what it was intended for, is to make sure that -- that, once the boat slip owners association was formed and they took over the whole -- the whole area, that they could not be denied. And I really don't understand the need for that because it was already common area and to own a boat slip you had to own property in Park Place, so I really don't see the need for that, but the attorney felt, apparently felt, the need for that.

Q. Did you at that time or anytime after that feel like you needed to grant the boat slip owners any other easements?

A. No, sir.

Q. And why is that?

A. It's common area. If you own property in Park Place and your dues are current, then you have the right to use the common area. And the boat dock is on the common area. In fact, you have the right to go fish off of the boat slips. I mean, it's common area.

Howard testified to the centrality of lake access to the Park Place community and what losing lake access means for its residents:

Q. If the homeowners association and the boat dock association do not have access to the lake, specifically to the boat dock and to the sun deck, how would that affect your original intent and plan?

A. I don't -- there's no way they could be denied access to the fixed dock. The bottom land, that could be a gray area. That's -- I mean, I'm not a lawyer, but there's no way they could be denied access to that fixed dock; it's on their property, period.

Q. But I guess I'm asking more conceptually.

A. Well, it would just ruin the subdivision; you won't be able to sell -- I mean, there's no lake there as far as selling lots. The whole subdivision is based on being able to access the lake, is what it's based on. And that's one reason that Oliver sold it to us because they saw our plan. There was another developer that had already made a substantial offer on that piece of property and it was turned down because of the concept plan he presented. When we

presented our concept plan, then we were sold the property and it was all about the use of the lake. And Lot 10 was the big -- was the big thing.

On cross-examination, Howard was asked a series of questions about the properties at issue:

Q. ...but my question is: Is the floating dock which contains the boat slips also on Lot 10, Block F?
A. No, sir. They are attached to Lot 10.
Q. And you mean physically attached.
A. Yes, sir.
Q. You mean there's cables that run to Lot 10...
A. And power, yes, sir, and a walkway.
Q. So there's a -- there's a -- there are improvements, if you will, that are constructed between Lot 10, Block F, the community association property, and the floating dock, correct?
A. Yes, sir.
Q. So, in order to get to the boat slips, the boat dock -- or the boat slip owners would have to cross property that's now owned by Mr. Phillips, correct?
A. Yes.
Q. And it's always been that way, hasn't it?
A. Yes.
Q. When you owned it, they had to cross your property, correct?
A. Yes.
Q. And that 2.4 acres is not platted as part of Park Place subdivision, is it?
A. It's part of Park Place Properties.
Q. My question is: It's not -- it's not platted as part of Park Place subdivision, is it?
A. No, sir.
Q. It's outside the subdivision, isn't it?
A. Well, I don't know if you'd call it outside the subdivision; it's outside of Lot 10.
Q. It's not shown on any plat of Park Place subdivision, is it?
A. Well, it should have been because it was owned by Park Place Properties.
Q. But it's not, is it?
A. I'm not sure.

Asked if Park Place lot owners had the right to go onto the 2.4 Acre Tract to access the lake, Howard stated: "They did when I owned it." Asked if they could still access the lake, Howard answered: "Apparently not." Howard acknowledged that he never granted an easement to Park Place homeowners when he had the opportunity to do so. The

following exchange occurred regarding the effect of the easement Howard reserved when he deeded the Common Area away:

> Q. Okay, so there's reserved to Park Place Properties, which was you, a right-of-way for ingress and egress from Harbor Approach and Lake Approach across Lot 10, Block F, for pedestrian and vehicular traffic and for parking in the existing area for the benefit of the owners, lessees, and invitees of the marina located on the Boone Lake embankment. The Boone Lake embankment is the 2.4 acres, correct?
> A. I don't know how you interpret that. I would interpret the Boone Lake -- yes, I guess it would be, yes.
> Q. Well, that's where the marina was, isn't it?
> A. Yes.
> Q. So it's a reservation of an easement for you as the owner of that 2.4 acres, which was not part of the Park Place subdivision. It was an easement for you to cross Lot 10, Block F, to go to and from the boat slips, wasn't it?
> A. Now that you...
> Q. Correct?
> A. ... -- now that you -- yes, sir. Now that you put it that way, yes, sir.

Mike Rogers ("Rogers"), a former resident of Park Place, testified next. At this point, Plaintiffs introduced some photographs of the site in question. Phillips' counsel objected. The following exchange occurred:

> MR. BEARFIELD: Now, Your Honor, I'm going to object to these photographs. These photographs have lines -- they're satellite photographs, but there are things on them that aren't on the ground, notably the lines. And those lines are not on the ground. Someone has -- someone in the world has put those lines on that aerial photograph and the likelihood of prejudice here is very high because those lines purport to represent tax parcel locations; and tax maps and tax parcel locations can never be used to prove a location of any piece of property. So, if they've got photographs that don't have lines on them, aerial photographs, I don't have any problems with them, but, there's a danger that, when someone sees this photograph, they're going to think that's the property line and it's not. There aren't any surveys in evidence here.
> Q. We're not submitting this for proof about property lines. I won't even -- I won't even ask him on these, these two photographs, about property lines. Really all we're trying to show is just a general overview of the neighborhood, in general where the -- where the 2.4 acres is with the boat dock. That's...

THE COURT: I will allow the exhibit, but I do agree with Mr. Bearfield that it would be inappropriate for me to put any reliance on the lines. I understand that simply because I've been in this business for a long time. So the lines, we will disregard them.

Exhibit 8 was admitted. Rogers proceeded to testify. Rogers testified that before late fall of 2015, when Boone Lake began to be drawn down, he used the boat dock "probably every day for months because we'd get off work, go down there, get on the boat, just relax, fish." Rogers also used the sun deck. Rogers saw other people using the sun deck, as well. The boat dock was accessed "from the cart path, by a stairwell, then across a gangway, floating gangway, to the boat slip." The sun deck was accessed "further up from the stairwell to the boat slips," and "by the cart path through the common area as well as the boat slips through the common area, down the stairwell and then to the sun dock." Rogers stated there was no other way to access those structures except by water. As to the importance he placed on lake access, Rogers testified: "Well, the reason we bought our house was for the lake access." Rogers testified that the 2.4 Acre Tract is mostly underwater and under the boat slips. Rogers stated that Phillips put up "no trespassing" signs in front of the 2.4 Acre Tract. According to Rogers, attempts to work out a resolution with Phillips over lake access went nowhere.

Archie Newberry ("Newberry"), a current resident of Park Place and President of the PPCA, testified also. Newberry had lived in Park Place since 2015. Newberry stated that only about 10 percent of the homes in Park Place have lake frontage. Newberry stated that the PPCA was formed in 2005. The PPCA, a homeowner's association, is governed by covenants, conditions, and restrictions, which include the following provision:

> 4.1 Function of the PPCA. The PPCA shall be the entity responsible for management, maintenance, operation and control of the Area of Common Responsibility and all improvements thereon. The PPCA shall be the primary entity responsible for enforcement of this Declaration and such reasonable rules regulating the use of the Properties as the Board or the Membership may adopt pursuant to Article 10. The PPCA shall also be responsible for administering and enforcing the architectural standards and controls set forth in this Declaration. The PPCA shall perform its functions in accordance with the Governing Documents and the laws of the State of Tennessee.

Asked why the PPCA sued Phillips, Newberry testified: "We felt that, since we are a community on the lake, that obviously if we don't have access to the lake in any form or fashion, then our property values will decrease. So it's going to harm the residents of the

community." Newberry testified that his organization was seeking "to reestablish what we believe [is] a right of easement to both the community sun deck and to the boat slips."

Larry Staggs ("Staggs"), a member of the PPBDA, testified that he had lived in Park Place since May 2007. Staggs also bought a boat slip in 2007. Staggs received a bill of sale for his boat slip and a warranty deed at the same time. Staggs had been paying property taxes on his boat slip since 2012. $20,000 was added to the value of Staggs' property as the boat slip constituted an improvement. Staggs stated that he carried insurance on his boat slip. Staggs stated that lake access was a "huge factor" in buying his home in Park Place. Staggs testified to his understanding of his rights as a Park Place homeowner:

> Well, when we purchased the house we were told that the common area was for HOA members. As long as your dues are paid in full, you could use the common area, the sun deck, and, since we had ownership of a boat slip, that we had use of that boat slip. And there were no restrictions on it other than the fact that your dues had to be paid, your HOA dues had to be current.

Staggs stated that he used the sun deck before the lake began to be drawn down in 2014. Staggs also liked to fish. Asked why the PPBDA formed,[2] Staggs testified:

> Q. All right. Were you familiar with why the boat dock association was formed?
> A. The original reason that we formed it was Jerry had made the remark in the past that, if we would form an association of slip owners, that he would turn the property over to the slip owners, the property where the sun dock and the boat slips are located. So that was the initial purpose of forming it to begin with. And, by the time we finished, it was obviously too late because his property had been seized due to his bankruptcy.
> Q. Did the association do anything to maintain the dock?
> A. We did repair the anchors to it. We did some electrical repairs. And those are two of the biggest things that I recall that were lacking. When we were forming the association, we realized that it needed to be done because it was a safety issue.
> Q. And how long did the boat dock association continue to maintain the boat dock?
> A. Until the water went down and it became unusable up until the point where it got to where we weren't able to access it due to the sign being posted as -- or being told that we couldn't access it.
> Q. Are you talking about a no-trespassing sign?

---

[2] The PPBDA was formed in August 2013.

A. Yes.

On cross-examination, Staggs stated that his boat slip was not physically attached to his property. Staggs testified that he could sell his boat slip to another member of the PPCA as long as their dues were paid in full, although he could not cite to a specific charter provision or by-law to that effect. Asked whether Howard once owned the 2.4 Acre Tract, Staggs stated: "I knew that he owned the strip of land between the common area and the lake. I had no idea that he owned the lakebed." However, Staggs testified he knew "that little strip of land" was not part of the Park Place subdivision. Staggs stated he just assumed he had a right to access his boat slip even though he had never seen a document to that effect. Staggs testified:

Q. So, if you in fact have no right to access the boat slip, someone misled you. Isn't that right?
A. I don't -- I don't know that I was misled. I mean, I was told that I had the right to access my property, which was the boat slip.

Kristy Dunbar ("Dunbar"), treasurer/secretary of the PPBDA, testified next. Dunbar had lived in Park Place since 2009. Prior to 2014, Dunbar understood that "[e]veryone in the community" had access to the sun deck. Dunbar bought her home from the defendant, Phillips. According to Dunbar, Phillips told her there was a community dock and boat slips for sale. Dunbar testified that she and her family often used the sun deck. Dunbar stated: "In, I think it was, 2011 or '12 my sister moved in the neighborhood and her house had a boat slip and we would use the slips often with her." Dunbar testified to an occasion when Phillips called her and told her and her husband not to go to down to the boat slips. Dunbar testified that she paid taxes on her boat slip and her property value had gone up. Dunbar also carried insurance on her boat slip. Dunbar stated that she anticipated the lake level would rise again soon. Dunbar testified that lake access was the reason she moved to Park Place; indeed, it was "the only reason." Dunbar's husband, Jamey, also testified. His testimony was largely in accord with his wife's.

Leanne Click ("Click") testified. Click had lived in Park Place for two-and-a-half years. She bought a boat slip in 2013. Click also owned a vacant lot in the subdivision. Click testified to her use of the boat slip with friends and family. Regarding the boat dock, Click stated that she was "down there a lot" during the summer. Click stated that if she no longer has access to the lake, she will probably sell her house because lake access is the "whole reason" she lives in Park Place.

Phillips testified, as well. Phillips earned a degree in nuclear physics from the University of Tennessee. After working for a few years as a project manager at Bosch, Phillips got into real estate investment. Phillips stated that he developed land in the area

near Park Place.  Phillips owns a house near the Common Area.  Phillips stated that in the ten years he spent building this house, he had not seen people using the Common Area or the boat dock.  Phillips testified:

Q. How long have you been -- is that home complete?
A. It's a house that we own, not a home.
Q. A house.  Okay, it's a house.
A. It is not complete.
Q. How long have you been constructing that.
A. I told you last time, 10 years.
Q. Can you see the boat dock from that house?
A. No.
Q. You cannot see the boat dock from that house.
A. I answered last time, if the trees were down and it was in the wintertime, you could see some of it, yes.
Q. So you could see the boat dock in the winter.  Is that what you're saying?
A. I think that's what the deposition said, yes.
Q. And you are aware that the boat dock was being used by boat slip owners that live in Park Place, correct?
A. No.
Q. You never knew that?
A. No.
Q. Were you a member of the Park Place Homeowners Association?
A. No.
Q. I show you this letter.  Have you ever seen this letter before?
A. Well, I can't read all of it, but it's addressed to Gary Phillips Development, "Dear Gary."  I probably got it.
Q. And does it say that you were late in paying your dues, that there was a past-due account for the Park Place Homeowners Association?
A. What's your question again, sir?
Q. Does it say that you were in violation of paying dues as a member of the Park Place Homeowners Association?
A. "This letter is to provide you written notice of unpaid dues of this amount," not in violation.
Q. Okay.
A. At least I don't see "violation."
Q. All right.  Well, did you owe unpaid dues to the Park Place Community Association?
A. No, sir.
Q. Do you know why they sent you this letter?
A. I do not, sir.

-11-

Q. So you've never been a member of the Park Place Homeowners Association?

A. No.

Q. Were you aware, just through your involvement in developing near the Park Place community, that there was a common area that was developed over time?

A. State the question again, sir.

Q. As a developer near the Park Place subdivision and as a -- as a house owner, if you want to say that, developing a house right near the common area, were you aware that there was a common area that was being developed over time by the homeowners association?

A. No.

Q. You couldn't see the common area from your home?

A. At what time, sir. You said the homeowners association, was I aware that the homeowners association developed the property? And I said no.

***

Q. Okay. And so, during that time that you've been building this house over the last 10 years, did you see people using the common area?

A. No.

Q. Were you aware there was a common area there?

A. Yes.

Q. Did you see people using the boat dock?

A. No.

Q. But you were aware there was a boat dock there.

A. I was aware there was a boat dock there, yes.

Q. And you were aware that there was a bank leading down from the common area to this boat dock.

A. There's a bank on any lakeshore, yes.

Phillips was shown a letter he sent to the TVA stating, among other things, that he would be willing to sell the entire 2.4 Acre Tract for $260,000. Phillips' counsel objected on grounds of relevance, but the Trial Court allowed the line of questioning for purposes of showing that the 2.4 Acre Tract was very valuable to Park Place homeowners. Phillips testified:

Q. So, Mr. Phillips, you said that you would be willing to sell the -- you said to TVA that you'd be willing to sell the entire 2.4-acre tract to the homeowners association for 260,000.

A. I don't read that here. Where do you think that the whole thing is being sold?

Q. "Make an offer to purchase the above land as addressed or labeled on the drawing as Part A if the PPCA would make an offer of 260,000."

A. What's Part A? I don't know what Part A is. I don't see the drawing.

Q. Well, you wrote this. Can you tell me what you meant by...

A. I have no idea.

Q. You don't know what you meant?

A. No, sir. I don't see the drawing.

Q. Okay. But it was part of the 2.4-acre tract; that's what you were talking about.

A. It was something, yes.

Q. Okay. And then did you go on to say that, if you can't reach an agreement with the homeowners association, then you are asking TVA to revoke the permits to the boat slips. Is that correct?

A. [Where] does it say that, sir?

Q. "If these purported boat slip owners and the PPCA do not come to an agreement with the real property owner, then the real property owner must demand that TVA start the revoke process of these boat slips."

A. I didn't ask them; they had already started.

Q. Well, you were the real -- you were the real property owner you were referring to, correct?

A. They had already started the revoke process, sir.

Q. If you could just answer my question.

A. What was your question?

Q. You were the real property owner that you were referring to, correct? In that letter.

A. I was the real property owner, yes.

Q. And you were -- and you said that, if you couldn't reach an agreement with the PPCA, then you demand that the TVA start the revocation process for those boat slips.

A. They had already started it.

Q. That's not what I asked you. I asked you if you demanded...

A. That letter stands for itself, sir.

Q. Okay. And you stand by what you said in it.

A. The letter stands for itself.

Phillips disputed the Dunbars' testimony that he told them they could buy a boat slip from Howard. Phillips stated: "Oh, I totally dispute that. First of all, I sold the house to her and not him. Only her. They were not married when they moved in." Phillips'

counsel moved for dismissal under Tenn. R. Civ. P. 41.02(2). The Trial Court denied Phillips' motion.

In January 2021, the Trial Court entered its final judgment ruling in favor of Plaintiffs. While this written order did not provide any detail as to the Trial Court's reasoning, it contained a reference to the Trial Court's oral findings of fact and conclusions of law, stating: "After hearing testimony of the parties and witnesses, and consideration of all the evidence presented, the Court issued its findings of fact and conclusions of law via Zoom conference on December 16, 2020." The record contains a transcript of the Trial Court's oral ruling. Given the fact-intensive nature of this case, we deem it appropriate to quote extensively from the transcript of the Trial Court's oral ruling. In its detailed oral ruling, the Trial Court found and held as follows:

> The Park Place Community Association is a homeowners association organized in 2005. It consists of homeowners in the Park Place neighborhood development, which is located in Johnson City, Tennessee, on the shores of Boone Lake, a TVA lake. This, as I said, is adjacent to, or at least a lot of the parcels are adjacent to Boone Lake, but not all parcels.
>
> The development began sometime around 2001, initially by Park Place, LLC. The Court heard from Jerry Howard who was a member of that company and he was the primary individual involved in the development. He became the successor in interest of Park Place, LLC, becoming the sole developer of the neighborhood.
>
> The boat dock association is an association of boat slip owners who are also members of the homeowners association. It was formed to provide for maintenance of the boat dock and to generally oversee common issues relating to that boat dock. These two organizations are representing the interests of their membership in this litigation.
>
> Early in the development of the Park Place community, early being at the turn of the century, Jerry Howard built a sun deck overlooking Boone Lake. This is near Lot 10 of the development. Shortly thereafter, he constructed a 16-slip boat dock. It is very near the sun deck and it is also from the shoreline of Lot 10. So all of these two structures were installed on the shorelines of Lot 10 of the subdivision development.
>
> He had permission from the TVA for a larger boat dock, but what he constructed and what remains essentially unchanged is that 16-slip boat dock. One of the exhibits has a drawing that most accurately reflects the boat dock. It is in the record of this case.
>
> A long set of stairs were constructed down the side of the bank of Lot 10 leading to the access or leading and giving access to the sun deck. There was also stairs down the bank, again of Lot 10, leading to a floating walkway

-14-

or gang-plank and then on to the boat dock.  The boat dock is not on Lot 10; it is situated in the 2.4 acres that are in dispute.  But there are cables and a walkway and power from Lot 10 that attach over to the floating boat dock.

Now both of these structures were created by purpose as a way to enhance the amenities of Park Place subdivision.  They allowed the homeowners in the development to enjoy living on Boone Lake.  The majority of the lots in this development do not have lake frontage and they must use Lot 10 to access the lake.  Park Place subdivision was marketed and has been treated as such and has been enjoyed as a lake development.

Now Mr. Howard did create this Lot 10 common area.  There was a playground and, at one point, a gazebo and a large grassy area and a parking lot.  There is a golf cart path that goes to and through Lot 10.  He deeded this common area to the Park Place Community Association in 2005.

Mr. Howard was not careful in his documentation and his lack of carefulness was understood by the Court when he testified, because he was very sure of himself and always assumed that he had provided the homeowners everything that they needed to have lake access and the enjoyment of these two amenities in question.  But he did prepare a deed that reserved a "right-of-way for ingress and egress purposes from Lake Harbor Approach and Lake Harbor Approach -- excuse me -- from Harbor Approach and Lake Harbor Approach over and across the above-described property for pedestrian and vehicular traffic and parking in the existing parking area for the benefit of the owners, lessees, and invitees of the marina located on the Boone Lake embankment adjacent to the above-described property."  Of course, I've just read an excerpt from that deed for the common area from 2005.

It was Mr. Howard's intent to make sure that boat slip owners and their guests always had access to the boat dock and homeowners in the development and their guests had access to the sun deck.  There remained, though, a small strip of land between Lot 10 and the location of both features. It is a portion of the 2.4 acres that Mr. Howard continued to own prior to his 2013, 2014 bankruptcy.

Although there was no survey introduced in court, the evidence was clear enough and persuasive enough for the Court to find that the boundary between the Lot 10 common area and the flowage easement of the TVA are very close, if not adjacent.  When the lake is at normal capacity, the overwhelming majority, if not all, of the 2.4 acres lies below water and certainly all the 2.4 acres that is below the floating boat dock is below water when the lake is at normal capacity.

The stairs to the boat dock begin from the common area, Lot 10, continue over a portion of the 2.4 acres and then proceeds to the boat dock.

-15-

As I said, the boat dock is within the 2.4 acres. The stairs to the sun deck begin in the common area of Lot 10 and continue over a strip of the 2.4 acres and then it arrives at the sun deck.

Mr. Howard's bankruptcy in 2014 resulted in the 2.4 acres, plus two boat slips, coming within the bankruptcy court trustee, who proceeded to sell them in November of 2014, sell them by auction. The defendant Gary Phillips was the successful bidder at the auction and purchased the 2.4 acres from the bankruptcy trustee. Two to three weeks later, the defendant installed a no-trespassing sign on the property near the steps that lead to the boat dock, which prohibited the boat slip owners and members of the community association from using stairs to access the boat dock and the sun deck.

Now, the plaintiffs are seeking access over the defendant's 2.4 acres by means of the stairs to the boat dock and the stairs to the sun deck. They desire the right to maintain those stairs, to maintain the boat dock and sun deck so that the community in the development can continue to enjoy its use.

The boat dock has been in use by the boat slip owners as well as Park Place Community Association members since Mr. Howard began selling individual boat slips. By his rule and practice, only Park Place homeowners could acquire a boat slip. Over time, he did sell these individual slips to homeowners by means of a bill of sale and warranty deed, sometimes both. Other times he amended the covenants, conditions, and restrictions for the community association to acknowledge the sale of boat slips.

Now these homeowners from time to time either maintained or sold their homes in the Park Place neighborhood and would sell their slips to the new home purchasers or to others. These slip owners have paid property taxes on their slips over the years, at least, it appears, since 2012. The assessor of Washington County has added $20,000 to the property assessments for homes that also own a boat slip when those slips are recorded.

The stairs over the property and to the boat dock have been used on a continual, open, and obvious basis since its construction and placement on the shore of the Park Place community. The Court reached this opinion because I was persuaded by the testimony of Mike Rogers. Before the lake draw-down in 2014, he was there every day, often for months. It was a place to go to relax and fish. He used the sun deck heavily on weekends; he saw others doing that.

I also heard in regards to this matter from Larry Staggs. His testimony was persuasive. He used it several times per week; he would fish off of the boat deck. He would see people fishing from the sun deck and from the landing on the boat dock.

I heard from Kristy Dunbar. Her testimony was persuasive. She saw -- she used it and others that she observed used it multiple times per week. These amenities were used for picnic and fishing. It was a community gathering place.

I also heard from Jamey Dunbar. Her testimony -- excuse me -- his testimony was persuasive. He and his daughter fished from the sun dock often. He would see several people at the boat dock every day. I heard from Ms. Click. She would go to the lake four or five times a week when school was out. She's a school teacher.

I also heard from Gary Phillips on this matter. He owns a lot adjacent to the common Lot 10. He has been building his house there -- it is not his residence, his house -- for 10 years. To the Court he denied knowing the members used the dock. He asserted he didn't know the common area was near the deck and boat dock.

He did not give full answers to questions in the courtroom. He was evasive in his answers in the courtroom. He was not a reliable witness. He said he was aware of the boat dock, but denied it was ever used. He denies knowing about stairs to the boat dock or cart path. In his deposition he said he knew about the stairs. The Court was unable to rely on his testimony in that regard.

The Dunbars were truthful when testifying that, when they became interested in the property, that Gary Phillips sold their home to them and he told them there was a community dock for their use, which she used. Mr. Phillips denied that, but I believe the Dunbars on that issue.

These two amenities, the boat dock and the sun deck, are the two means for the neighborhood for those homes who do not have a lake frontage, which is the majority of the homeowners, for them to access the lake. The community association members have utilized the stairs over the Lot 10 and 2.4-acre strip portion to access the sun deck on a regular, near daily, basis. When the lake was at normal levels, they would enjoy picnics on the deck, fish from it, swim off of it, and simply enjoy the pleasures of the lake. Warm weather saw this activity on a daily basis.

The advertisements by Mr. Howard for homes in Park Place prominently featured lake access as a benefit of living in the neighborhood. He made it clear by verbal representations to all of the homeowners that the sun deck was for use by the neighborhood and it was treated as a common area.

Now several property owners testified in trial that lake access via the sun deck and the boat dock was a strong factor in the purchase of their homes or lots in the community, that this was a desirable feature and for many it was an essential feature that came with their lot or home.

-17-

Stated another way, lake access to these areas at Lot 10 common area was one of the primary amenities that interested people in moving to the neighborhood. Without that access, some homeowners may elect to move from the property to other areas that do have lake access. And some are rightfully concerned their property values will be negatively affected without lake access.

Implicitly, Mr. Phillips has recognized the lake access value and he has done that by asserting to the TVA that he wanted somewhere between 180,000 to $240,000 for a portion of the 2.4 acres associated with Lot 10 and the boat dock, not all of the 2.4 acres, but just a small portion. So even Mr. Phillips recognized that scores of thousands of dollars of value for property owners in his neighborhood is built into the access of the lake.

The boat dock association was formed in 2013 as a means of establishing the common interest among the boat slip owners to maintain and care for the boat dock. Since then, they have made structural repairs to the boat dock such as resetting posts, resetting anchor blocks, repairing decking, resetting anchors, and other repairs. They have paid for electrical upgrades to come into code. They, meaning the -- I'm referring to the boat slip association, has paid for electricity to the boat dock. Since 2018 defendant has refused to allow anyone from the boat slip owners association, the dock owners, to make any repairs or maintain the boat dock.

The Court further finds that the location of the boat dock has not moved. Although it has been floated, the location of the boat dock is where it has always been. The plaintiffs seek an easement by necessity or an easement by implication and also injunctive relief to exercise easement rights to access and utilize the boat dock and the sun deck. An easement in Tennessee is generally defined as a right an owner has to some lawful use of the real property of another.

I won't go into a lot of details, but let me talk about the two types of easement in question today. An easement by necessity is a type of implied easement based on the premise that, whenever a person conveys property, they also convey whatever is necessary for its beneficial use and enjoyment, including access to one's property.

Those asserting this, the plaintiffs in this case, must prove the following: The titles to the two tracts in question, Lot 10 and the 2.4 acres, must have been held by one person. In this case, Jerry Howard owned both and he conveyed the common area to the homeowners association.

So, when this conveyance occurred, it occurred in the backdrop of him also owning the 2.4 acres in the lake that is adjacent to Lot 10. Again, Mr. Howard is the person who filed bankruptcy and whose land the 2.4 acres was conveyed by the bankruptcy trustee to Gary Phillips. That element was met.

Two, the unity [of] title must have been severed by conveyance of one of the tracts. Jerry Howard conveyed Lot 10 to the Park Place Community Association and in that conveyance he specifically retained rights on behalf of the boat slip owners to go over the land and use the marina, in the Court's opinion. Even if the language is not interpreted that way, that was the intent.

And, by him selling boat slips, it is obvious that he intended to allow people who purchased boat slips from him to get to the boat slips that he sold, across his property. The substitute trustee conveyed to Gary Phillips the parcel of 2.4 acres previously owned by Mr. Howard, which was the means of access to the boat dock and sun deck.

When Mr. Howard conveyed the boat slip property rights, those rights were to be used in a pre-existing boat dock that was situated within the 2.4 acres retained by Mr. Howard, eventually purchased by the defendant.

The easement is necessary for the owners to use their land and it existed at the time of the severance of title and the time of the exercise of the easement. Without access across a strip of the 2.4 acres, the boat owners cannot access the boat dock and the members of the Park Place Community Association cannot access the sun deck.

There is no other way to get to the boat dock or sun deck from the neighborhood and Lot 10. Without this easement, Park Place community members will have no access to the lake, one of the prime benefits of living at a lake will be lost. This easement by implication, an implied easement -- excuse me -- an easement by necessity, a type of implied easement, has been proven.

An easement by implication is similar to a necessity easement. They must prove a separation of title. I have already discussed that. Second, the necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued, and obvious or manifest to show that it was meant to be permanent.

The use of both the boat dock and sun deck were of long duration, continuous, open and obvious, designed by the developer to be used by the community and promoted as a benefit of living at Park Place. In fact, approximately five years before Mr. Phillips purchased the 2.4 acres, Mr. Phillips was promoting the amenities of the boat dock and the fixed sun dock to potential property purchasers in the development.

The Court finds, notwithstanding his denials, that Mr. Phillips was well aware to the use of the boat dock and sun deck by the residents in the community. As I said earlier, he had been building his house, which is next to these amenities, for 10 years. He's had multiple conversations with property owners. He's received multiple mailings that refer to the common

-19-

areas. He knew the auctioneer was selling two boat slips for the boat dock floating over the 2.4 acres.

Mr. Phillips's testimony may not be reliable, but his intelligence and experience in real estate matters is keen and observant. He knew exactly what he was doing when he bought the 2.4 acres. And he knew the 2.4 acres, for many years, had been partially accessed by the Park Place owners to access these amenities, and that they had assumed and used full use of the sun deck and boat dock for recreational activities.

The owners of the boat slips assumed they had full use of the boat dock and their slip and full access to it. And Mr. Howard encouraged and promoted that understanding, both verbally and in writing.

Now, so long as he was the developer, members of the Park Place neighborhood had full use of these areas and when he was developing this development Mr. Phillips knew all about this. The necessity is that the easement be essential to the beneficial enjoyment of the land granted or retained has been proven.

This case, the Court finds, is very similar and I have relied heavily on the guidance of the case of The Pointe, LLC, versus Lake Management Association, Incorporated. The facts are similar. The marina and sun deck or boat dock were developed by Jerry Howard specifically to enhance the value and amenities of the Park Place subdivision.

Mr. Phillips was also buying and selling property in the development and received the financial benefits derived from his own promotion of these amenities to his buyers. Those items were used by Mr. Howard and Mr. Phillips to induce sales of the properties in the subdivision.

Now Mr. Howard took steps to protect that use solely by the homeowners. At no time was it ever contemplated that the homeowners would not have use and enjoyment of these amenities. He was fully aware of the use of the boat dock and sun deck long before he acquired the property in the trustee's sale. All the way back in 2014 he signed an addendum to real estate purchase and sale agreement referring to a common land. And he, as I said earlier, made representations to the Dunbars specifically about these amenities.

These boat slips had value. They were sold for about $10,000 each, either by a separate transaction or built into the price of homes. Gary Phillips was involved in Park Place transactions as early as 2004, well before he purchased it and for many years when it was being used, the common area was being used, from Lot 10 to access these two amenities.

Exhibit 7 represents the transfer of boat slips which triggered the reassessment of those slips to property owners. Mr. Howard certainly thought that these amenities came with Lot 10 common area because he

believed the land, the 2.4 acres, had very little value. I agreed with his testimony that it would ruin the subdivision if there's no lake access. The Court does find that the 2.4 acres was not platted, though, as part of the Park Place development.

The Court also relied on Exhibits 32 and 33. Defendant's Exhibit 32 and 33 were of particular significance. This amendment is where Jerold Howard, quote, "Is to convey ownership of each slip to the individual property owners as shown below," unquote. Continuing the quote, "Jerold R. Howard hereby grants and conveys ownership of said slips and relinquishes to each owner the tax obligation associated with each slip," unquote. This was filed February 10, 2011, and was on record in the chain of title before the auction and the trustee's deed to defendant.

The Court finds that approximately 50- to $60,000 has been paid by the boat slip owners for the boat slips. This was, the boat slip value was, added as an additional assessment on the property taxes of Mike Rogers. He paid roughly 8,000 for the boat slips. Each slip is numbered; there is no confusion as to which boat slip belongs to whom. $20,000 was added to the tax bill of Larry Staggs.

Kristy Dunbar has lived in the development since 2009. Her sister in 2011 or '12, Valerie Elliott, purchased in the neighborhood and had a boat slip. Ms. Dunbar paid $5,500 for hers. Her assessment went up by $20,000.

Mr. Phillips is a home builder and a developer. He was aware of the common area and its usage throughout those 10 years that he's owned the property. He received correspondence related to the common area from the homeowners association. He paid $5,500 for the 2.4 acres. The declaration of covenants were in his chain of title prior to his purchase.

Although he has denied lake access is an important feature of home ownership, he did essentially contradict himself by asking nearly a quarter of a million dollars for this access, or stating that it was worth that. I don't know whether he asked that of the association or not, but he's made representation to the TVA that he believes it's worth that.

At most of this 2.4 acres, .3 acres may be above water, but I seriously doubt very much at all is above water. Mr. Phillips saw the two boat slips as being offered for sale at the auction. His deed says that they're subject to the covenants, and he put up the no-trespass sign.

For all of these reasons, the Court rules finally as follows: The plaintiffs are granted judgment against defendants as the Court recognizes they have easement rights over the 2.4 acres to maintain and utilize access to the sun deck and the boat dock, the stairs, and the associated cables, electricity, anchors for the boat dock, and to maintain those and to maintain the boat dock in its present location within the 2.4 acres and to have access

to those, for owners of the boat slips, of the 16 only, not to be expanded, of the 16 boat slips and their invitees and to all of the Park Place Homeowners Association members and their invitees to the sun deck.

The Court recognizes that the plaintiffs own the boat dock and the boat slips and the sun deck. Defendants are enjoined from their peaceful -- the plaintiffs' peaceful use of these two amenities and from the use of their easement to maintain and access these amenities.

Phillips timely appealed to this Court.

## Discussion

Although not stated exactly as such, Phillips raises the following issues on appeal: 1) whether the Trial Court erred in denying Phillips' motion to dismiss for lack of standing; 2) whether the Trial Court erred in admitting an aerial photograph into evidence featuring superimposed lines purporting to show property boundaries when there was no authentication of the photograph; 3) whether the Trial Court erred in granting the PPCA and its members, as well as the PPBDA and current and future owners of boat slips and their invitees, easement rights to cross the 2.4 Acre Tract to access the sun deck, the boat dock, the boat slips, stairs and walkways leading to same, and associated cables, anchors and electrical power to same; and 4) whether the Trial Court erred in granting the PPCA ownership of the sun deck and the PPBDA ownership of the boat dock when that relief was not requested in Plaintiffs' complaint or litigated.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and

convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ––– U.S. ––––, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

Before addressing Phillips' issues, we identify an issue *sua sponte*. The Trial Court's January 2021 written final judgment was rather bare-bones. It simply contained the Trial Court's ultimate conclusions. The Trial Court's rationale for ruling as it did can only be found in the transcript of the Trial Court's oral ruling. However, the Trial Court did not explicitly incorporate the transcript of its oral ruling into its written final judgment. This can pose a problem. As we have stated, "[t]he law in Tennessee is well-settled that the court speaks through its order, not through the transcript, so appellate courts do not review the court's oral statements, unless incorporated in a decree." *Terry v. Jackson-Madison Cty. Gen. Hosp. Dist.*, 572 S.W.3d 614, 629 (Tenn. Ct. App. 2018) (citation omitted). In *Terry*, we found that the trial court judge "clearly *did* incorporate his oral findings into his final order by reference." *Id.* at 629 (emphasis in original). Here, it is less clear. This is significant because the Trial Court's January 2021 written final judgment is, on its own, insufficient to enable our appellate review.

Nevertheless, the Trial Court's written final judgment did contain a reference to the Trial Court's oral findings, stating: "After hearing testimony of the parties and witnesses, and consideration of all the evidence presented, the Court issued its findings of fact and conclusions of law via Zoom conference on December 16, 2020." In addition, neither party raises an issue of whether the Trial Court incorporated its oral ruling. In view of these facts, we find and hold that the Trial Court sufficiently incorporated the transcript of its oral ruling into its written final judgment such that we may proceed with our appellate review. Going forward, however, we respectfully urge trial courts wishing to incorporate transcripts of their oral rulings into their written final judgments to do so explicitly and unambiguously lest we have to vacate and remand for clarification, which costs time and money for the parties.

We now move to Phillips' issues, beginning with whether the Trial Court erred in denying Phillips' motion to dismiss for lack of standing. The Tennessee Supreme Court has set out the following test for associational standing:

To establish standing, an association ... must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

*American Civil Liberties Union of Tennessee v. Darnell*, 195 S.W.3d 612, 626 (Tenn. 2006) (citations omitted). Phillips asserts various points on this issue, to wit: (1) that Plaintiffs failed, both in their complaint and at trial, to prove that the interests they seek to protect are germane to their purposes; (2) that the PPCA failed to introduce its charter; (3) that the PPBDA introduced its charter but failed to introduce its by-laws, and in any event failed to establish that the interests it seeks to protect are germane to its purpose;[3] (4) that "neither the Boat Dock nor the Boat Slips were ever platted or identified by Howard on any written instrument, recorded or unrecorded"; (5) that the PPBDA failed to prove it had authority over individual members including members who bought boat slips prior to the PPBDA's formation in 2013; (6) that "the claims asserted and the relief requested by the PPCA and the PPBDA required the participation of the individual members of each organization in the lawsuit"; and (7) that Plaintiffs' officers testified in an individual, rather than official, capacity.

Phillips fails to reckon with *River Plantation Homeowner's Assn., Inc. v. Capps*, a case in which this Court found that a homeowners association had standing to sue to enforce its subdivision's restrictions. After reviewing certain authorities, we stated as pertinent:

As discussed in these sources, a homeowners association has a legitimate and recognized interest in seeking to enforce restrictions applicable to its subdivision. That is especially so where, as here, the homeowners association consists of the property owners themselves. In other words, this is not an outside entity lacking connection to the interested parties. This is, instead, a representative group of the interested parties.

*River Plantation Homeowner's Assn., Inc. v. Capps*, 587 S.W.3d 755, 767 (Tenn. Ct. App. 2019). While this case is not about the enforcement of a restriction *per se*, we find that the question of lake access also implicates Plaintiffs' interests as homeowners associations. In *River Plantation*, we recognized that a statute or a provision in the homeowners association's governing documents could limit that association's ability to sue on behalf of its members. *Id*. at 767. In the instant case, Phillips points to no charter provision, by-law,

---

[3] The PPBDA's charter provides that the organization is formed to provide an entity "for the furtherance of the interests of the Owners." Phillips notes that "Owner" is undefined.

or statute that would serve to preclude Plaintiffs from bringing this action. As Plaintiffs state in their brief: "Every owner in Park Place is a member of the HOA. The HOA owns property in the subdivision, the common area which abuts the lakeshore. Each boat slip owner is a member of the [PP]BDA, and membership is appurtenant to, and inseparable from, ownership of a boat slip." Plaintiffs continue: "These associations are representing the owners' interests in this action, which is to retain access to the lake." We agree. Plaintiffs are "representative group[s] of the interested parties." *River Plantation*, 587 S.W.3d at 767. The exacting mission statement or membership rolls envisioned by Phillips are unnecessary. Under the precedent of *River Plantation*, Plaintiffs have standing to bring this action. We affirm the Trial Court on this issue.

We next address whether the Trial Court erred in admitting an aerial photograph into evidence featuring superimposed lines purporting to show property boundaries when there was no authentication of the photograph. Phillips cites to *Conder v. Salyers* for the proposition that tax maps such as these are not admissible for proving ownership of land. 421 S.W.3d 589, 593 n.2 (Tenn. Ct. App. 2013) (citing *Whitworth v. Hutchison*, 731 S.W.2d 915, 917 (Tenn. Ct. App. 1986)). However, the Trial Court stated quite clearly at trial that it would disregard the lines on the photograph. We have no reason to believe that the Trial Court did not do what it said it would do and disregard the lines. It appears from the record that the photograph was admitted merely to provide the Trial Court with an overview of the area at issue. The photograph's admission was neither outcome-determinative nor in any sense prejudicial to Phillips. This issue is without merit.

We next address whether the Trial Court erred in granting the PPCA and its members, as well as the PPBDA and current and future owners of boat slips and their invitees, easement rights to cross the 2.4 Acre Tract to access the sun deck, the boat dock, the boat slips, stairs and walkways leading to same, and associated cables, anchors and electrical power to same. This case involves two types of easement—one implied from prior use, and one by necessity. With respect to the elements of an implied easement, this Court has discussed:

> As this Court explained in *Eberle v. Elliott*, No. E2012-00298-COA-R3-CV, 2013 WL 3421940 (Tenn. Ct. App. June 28, 2013):
>
>> Tennessee courts have long held that to find the existence of an easement by implication, the following elements must be present:
>>
>>> (1) A separation of the title; (2) Necessity that, before the separation takes place, the use which gives rise to the easement shall have been long established and

-25-

obvious or manifest as to show that it was meant to be permanent; and (3) Necessity that the easement be essential to the beneficial enjoyment of the land granted or retained.

*Id*. at \*8 (quoting *Cellco* [*P'ship v. Shelby Cty.*], 172 S.W.3d [574] at 589 [(Tenn. Ct. App. 2005)]). Stated differently,

Where, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude is in use at the time of severance and is necessary for the reasonable enjoyment of the other part, on a severance of the ownership a grant of the right to continue such use arises by implication of law.

*Barrett* [*v. Hill*], [No. 01A01-9806-CV-00295,] 1999 WL 802642, at \*3 [(Tenn. Ct. App. Oct. 7, 1999)] (quoting *Lively v. Noe*, 496 S.W.2d 852, 854-55 (Tenn. Ct. App. 1970)). The elements must be proven by a preponderance of the evidence. *Eberle*, 2013 WL 3421940, at \*8.

There are two types of implied easements – easements implied from prior use and easements by necessity. *Id*. at \*9. There is considerable overlap between the two types, which can lead to confusion. *Id*. (citing *Ingram* [*v. Wasson*], 379 S.W.3d [227] at 240 [(Tenn. Ct. App. 2011)]). Both are implied arising from a conveyance and hinge on a finding of necessity. *Id*. However, an easement by necessity does not depend on prior use and " 'may allow for a route of access where one previously did not exist.' " *Id*. (quoting *Ingram*, 379 S.W.3d at 240). "Easements of necessity, also called easements by necessity or ways of necessity, are typically implied to provide access to a landlocked parcel." *M.C. Headrick & Son Enters., Inc. v. Preston*, No. 124, 1989 WL 37262, at \*7 (Tenn. Ct. App. Apr. 20, 1989) *perm. app. denied* (Tenn. Nov. 27, 1989). On the other hand, where a prior use exists, "courts often require a showing of lesser necessity." *Id*. "Implication of an easement from a prior use is based on the protection of a purchaser's reasonable expectations that his or her use of an easement will be a continuation of her predecessor's use." *Rogers v. Roach*, No. M2011-00794-COA-R3-CV, 2012 WL 2337616, at \*7 (Tenn. Ct. App. June 19, 2012).

*Isaacs v. Fitzpatrick*, No. M2018-01863-COA-R3-CV, 2019 WL 3729857, at \*10-11 (Tenn. Ct. App. August 8, 2019), *no appl. perm. appeal filed*. An easement by necessity, a somewhat overlapping type of implied easement, requires the following: "1) the titles to

-26-

the two tracts in question must have been held by one person; 2) the unity of title must have been severed by a conveyance of one of the tracts; 3) the easement must be necessary in order for the owner of the dominant tenement to use his land with the necessity existing both at the time of the severance of title and the time of exercise of the easement." *Cellco P'ship v. Shelby Cty.*, 172 S.W.3d 574, 592 (Tenn. Ct. App. 2005) (quoting *Powell v. Miller*, 30 Ark.App. 157, 785 S.W.2d 37, 39 (1990)).

Phillips raises several arguments on this issue, to wit: (1) that the Trial Court failed to identify whether it was granting an easement by implication or an easement by necessity; (2) that, with respect to both the PPCA and the PPBDA, there was no evidence of separation of title, long and continued use, or necessity that the easement was essential to the beneficial enjoyment of the land granted or retained; and (3) that Plaintiffs failed to prove "the easement is necessary in order for the owner of the dominant tenement to use its land with the necessity existing both at the time of the severance of title and the time of exercise of the easement." Phillips also argues broadly throughout that, in effect, any harm done to Plaintiffs by denial of lake access is Howard's fault for not granting them an easement when he had the chance. We address Phillips' arguments in turn.

With respect to the Trial Court's alleged failure to identify which type of easement it found, we note that the Trial Court stated in its January 2021 written final judgment that "[t]he Court found the Plaintiffs have proven the elements of the causes of action for easement by necessity and easement by implication over the 2.4 acre tract…." In its oral ruling, the Trial Court found: "This easement by implication, an implied easement -- excuse me -- an easement by necessity, a type of implied easement, has been proven." We find that the Trial Court made it sufficiently clear that it found both an easement by implication and easement by necessity had been proven. However, even if only one or the other type of easement had been proven, the effect of the ruling would be the same. As we will discuss, both types of easement were proven.

Regarding unity of title, Phillips states that the Trial Court failed to identify a dominant or servient tract; that unity of title of the two tracts at issue was never proven; and thus, there was never a separation of title. For their part, Plaintiffs argue that unity of title and subsequent separation were established by recitations of title derivation in the deed for Lot 10 of Block F and the deed for the 2.4 Acre Tract purchased by Phillips. In their brief, Plaintiffs state:

The Quitclaim Deed from Mr. Howard to the HOA for the Lot 10 common area contained the description that it was "<u>part of the same property</u> conveyed to Park Place Properties, L.L.C., by deed from Charles Woodrow Oliver and Anna N. Oliver, <u>by deed of record on Roll 107, Image 1272</u>; as corrected and recorded on Roll 108, Image 1603, in the Register's Office for Washington

-27-

County Tennessee." (Emphasis added). (Pl. Exh. 5A). The deed to the 2.4 acre tract contained that same description: "<u>a part of the same property</u> conveyed to Park Place Properties, LLC, <u>by deed of record in said Register's Office on Roll 107, Image 1272</u>, as corrected on Roll 108, Image 1603." (Emphasis added).

(Emphasis in original). Plaintiffs also point to the trial testimony, stating "there is no question that Jerold Howard was the common owner of the two tracts at issue, the common area of Lot 10 and the 2.4 acre tract. Phillips offered no evidence to the contrary." In his reply brief, Phillips argues that the clauses of the prior deeds constitute hearsay and cannot be used to establish unity of title. However, even if we agreed with Phillips, which we do not, that the derivation clauses in the prior deeds constitute inadmissible hearsay to establish chain of title, it is clear from the rest of the record, including the trial testimony, that Howard originally owned both the Common Area and the 2.4 Acre tract before deeding the former to the PPCA in 2005 and parting with the latter through bankruptcy in 2014; we find no evidence to the contrary.

Phillips argues, nevertheless, that "mere common ownership is insufficient to establish unified title." Phillips argues instead that proof of a common parent tract is necessary to establish unity of title. Phillips cites *Cole v. Dych*, 535 S.W.2d 315, 318 (Tenn. 1976) (citing *Line v. Miller*, 309 S.W.2d 376, 377 (Tenn. Ct. App. 1957)) for the proposition that easements by implication are "premised upon the presumption that they were within the contemplation of the parties, and must be supported by a unity of title." *Cole*, 535 S.W.2d at 318. In *Line*, this Court held:

> One element necessary to the existence of an implied easement is unity of title to both tracts at the date of the supposed conveyance of the dominant right. Johnson v. Headrick, supra. In this case, while it is shown that at one time all three lots were owned by complainant's grantor, it is not shown that unity of title existed when complainant purchased Lot 13, at which time it is claimed the easement was conveyed by implication. It results that if we are in error in holding that no easement by implication was created, complainant still cannot maintain the bill since there is no proof that her predecessors in title owned both lots when they conveyed Lot 13.

*Line*, 309 S.W.2d at 377.

However, we do not find that *Cole* or *Line* necessarily mandate the holding Phillips seeks here. The issue is what constitutes sufficient unity of title for purposes of an implied easement. In a 1989 case wherein unity of title was challenged for purposes of an implied easement, we stated:

The Appellant here argues that an implied easement cannot exist upon its property because the elements giving rise to it have not been proved. It is Appellant's contention there was no unity of title at the time of severance because its parcel, i.e., the 50-foot strip upon which the encroachment lies, was owned by F.B. Jones Construction Company, Inc., and Defendant's parcel was owned by Jones, individually.

*M.C. Headrick & Son Enters., Inc. v. Preston*, No. 124, 1989 WL 37262, at *4 (Tenn. Ct. App. Apr. 20, 1989) *perm. app. denied Nov. 27, 1989*. We then discussed a treatise called *The Law of Easements and Licenses in Land* (Warren, Gorham & Lamont, Inc., Boston, 1988), stating: "Identical concurrent ownership fulfills the unity-of-title requirement." *Id*. at *5. We concluded that Jones was the "common owner for unity of title purposes." *Id*. at *6. This Court agreed with and quoted from the trial judge, who stated as follows in his memorandum opinion:

> Here the unity of title as between Jones and his corporation is at least as great, if not greater, than in the three cases cited in the 94 A.L.R.3d annotation when sufficient unity was declared. Jones had sole and complete dominance over the construction company at the time immediately before the separation of titles-viz., the sale from Jones individually to Peerless. The Court is of the opinion that there was sufficient unity of title when Peerless purchased the Defendant's Lot to give rise to an easement by implication.

*M.C. Headrick & Son Enters., Inc.*, 1989 WL 37262, at *6.

Here, it is clear from the evidence at trial, including the trial testimony, that Howard originally held concurrent, common ownership of the Common Area and the 2.4 Acre Tract. In our judgment, Howard's concurrent common ownership of the Common Area and the 2.4 Acre Tract made him the common owner for unity of title purposes. When Howard deeded the Common Area to the PPCA in 2005, title was separated. To the extent there is any confusion as to which tract is dominant or servient, the Common Area is the dominant tenement and the 2.4 Acre Tract is the servient tenement over which Plaintiffs' members pass to access Boone Lake.

With respect to the remaining elements for an easement by implication—long and continued use and the necessity that the easement was essential to the beneficial enjoyment of the land granted or retained with respect to both the PPBDA and the PPCA—the Trial Court made detailed factual findings relevant to these elements. Multiple witnesses testified to their prolific use of the sun deck and boat slips. While most of this evidence stemmed from the more recent past, Howard testified to Park Place's history from its

inception. The Trial Court implicitly credited Howard's testimony. In addition, the Trial Court found that "lake access to these areas at Lot 10 common area was one of the primary amenities that interested people in moving to the neighborhood." The Trial Court continued: "Without that access, some homeowners may elect to move from the property to other areas that do have lake access. And some are rightfully concerned their property values will be negatively affected without lake access." The evidence does not preponderate against these or any of the Trial Court's factual findings. The Trial Court also stated it agreed with Howard that "it would ruin the subdivision if there's no lake access." While Phillips argues that mere recreation and enjoyment are insufficient bases for finding an implied easement or an easement by necessity, lake access is tied directly to the values of Park Place homes, and, in some cases, represents the very reason why homeowners bought in Park Place in the first place. Lake access is the *raison d'être* for Park Place; it is essential.

In another case involving an implied easement and lake access, *The Pointe, LLC v. Lake Management Ass'n, Inc.*—which the Trial Court relied upon and both parties cite, albeit to different ends—this Court found, in part:

> In the case at bar, it is undisputed that Garner Lake was built in the early 1960's for the purpose of a lake community development. LDC developed the Lake for recreational purposes and developed subdivisions around the Lake imposing restrictions concerning the recreational use of the Lake by purchasers in those subdivisions. The activities of LDC clearly show that the Lake was intended to be the motivating factor to induce the purchase of the property in these subdivisions. Proof in the record shows that the Lake has a direct influence on the value of the properties on its banks.

> In determining whether the above elements are met in this case, the record first demonstrates that Plaintiffs' property was, at the time of the conveyance, part of a larger estate which included the land under Garner Lake. LDC's sale of the Property to Plaintiffs separated the unified title. Second, the Lake has existed for over thirty years and is clearly meant to be a permanent feature of Lakeland, Tennessee and, more specifically, of the developments surrounding the Lake. Third, the proposed easement is reasonably necessary to the beneficial enjoyment of Plaintiffs' land because, without lake access, that land is worth significantly less. The fact that Plaintiffs' lender withdrew its commitment to make a multi-million dollar loan is clear evidence of the decreased value. Based on the foregoing, we find that the conveyance of the property to Plaintiffs adjacent to Garner Lake carried with it an implied easement appurtenant which gives Plaintiffs the right of reasonable access to the Lake.

*The Pointe, LLC v. Lake Management Ass'n, Inc.*, 50 S.W.3d 471, 478-79 (Tenn. Ct. App. 2000).

The centrality of lake access for Park Place is manifest, and Plaintiffs' members have no means of accessing the sun deck or boat slips except by crossing over the 2.4 Acre Tract. These homeowners and boat slip owners simply cannot "use" their property without the ability to across the 2.4 Acre Tract. While Phillips points out that Howard failed to grant Plaintiffs an easement over the 2.4 Acre Tract when he had the chance, that did not preclude Plaintiffs from proving an implied easement from prior use or an easement by necessity. As a final point, we note the Trial Court's credibility determinations in favor of Plaintiffs' witnesses and against Phillips. Of particular significance, the Trial Court specifically did not credit Phillips' testimony that he was unaware of Park Place residents' prior use of the boat dock and sun deck. We find no clear and convincing evidence in this record to overturn the Trial Court's credibility determinations.

In sum, Plaintiffs have proven (1) unity of title and separation of that title; (2) long and continued use; (3) necessity that the easement is essential to the beneficial enjoyment of the land granted or retained; and (4) that access to the boat dock and sun deck is necessary for the owners of the dominant tenement to use their land, with the necessity existing both at the time of the severance of title and the time of exercise of the easement. As discussed above, the evidence reflects that lake access has been vital to Park Place from its inception. We affirm the Trial Court in its finding that Plaintiffs proved both an implied easement by prior use and an easement by necessity over the 2.4 Acre Tract.

The final issue we address is whether the Trial Court erred in granting the PPCA ownership of the sun deck and the PPBDA ownership of the boat dock when that relief was not requested in Plaintiffs' complaint or litigated. Phillips states: "Nowhere in their Answer [sic] did the Plaintiffs assert that they were also seeking ownership of the Sun Deck or Boat Dock. The Plaintiffs likewise made no request for ownership of the Sun Deck or Boat Dock at Trial and presented no proof of ownership of the Sun Deck or Boat Dock at Trial." Phillips cites *Britt v. Massengill* in support of his contention that the Trial Court erred by deciding matters not raised by the parties in their pleadings. In *Britt*, we stated, in part:

> The relief requested by the Britts in their pleadings was based upon a violation of the Tennessee Consumer Protection Act. The Britts did not request or offer evidence in support of mutual mistake or rescission of the contract, nor were the Massengills given an opportunity to respond to such relief. In addition to a request for damages, costs, and attorney's fees, the Britts made a prayer for general relief in their pleadings. While courts of

equity have the power to grant relief liberally under the general prayer for relief, there are well recognized limitations which courts may not overlook. *See Caldwell v. Huffstutter*, 116 S.W.2d 1017, 1019 (Tenn. 1938). "The relief granted must be clearly within the scope of the bill, and it must not be either antagonistic to, or altogether different from, that specifically prayed for." *Id*. The trial court's judgment held that there was a mutual mistake between the parties and ordered the contract rescinded on those grounds. The relief granted was not within the scope of the pleadings or the proof. Under the state of the record before us, the relief granted should have been confined to the relief sought in the pleadings. Accordingly, the trial court's decision on this issue is reversed.

*Britt v. Massengill*, No. W1999-01129-COA-R3-CV, 2001 WL 204209, at *3 (Tenn. Ct. App. Feb. 26, 2001), *no appl. perm. appeal filed*. In addition, Tennessee Rule of Civil Procedure 54.03 provides, in relevant part: "[T]he court shall not give the successful party relief, though such party may be entitled to it, where the propriety of such relief was not litigated and the opposing party had no opportunity to assert defenses to such relief."

However, Plaintiffs, in their complaint, specifically asked for "a Judgment in favor of Plaintiffs and against Defendants recognizing Plaintiffs' ownership of the boat dock and boat slips," alongside a permanent injunction. Among other evidence adduced at trial, Howard testified to the PPCA owning the sun deck and that he sold boat slips to Park Place property owners. Ownership of the sun deck and boat dock was sufficiently pled and tried. We affirm the judgment of the Trial Court in its entirety.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Gary Phillips, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-32-